**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 93-1126**

_____

**UNITED STATES of AMERICA,**

**Plaintiff-Appellee,**

**versus**

**PAUL ARLIN JENSEN,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Northern District of Texas**

_____

(December 20, 1994)

Before WIENER, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Paul Arlin Jensen (Jensen) appeals his convictions on 18 counts stemming from a fraudulent scheme which lead to the failure of certain savings and loan institutions. We affirm.

### I.   FACTS AND PROCEDURAL HISTORY

In 1982, Jensen, Van Zinnis, and William Tar were partners in a California mortgage brokerage company called Mountain West. The company was seeking borrowers through an advertisement. Clifton Brannon, a builder in the Dallas area, answered the ad. As a result, Jensen flew to Dallas and met with Brannon. Jensen introduced himself as a medical doctor with an impressive business

-1-

career and told Brannon that he wanted larger projects than the one presented by Brannon. He further stated that he and his employer at Mountain West were interested in acquiring a savings and loan. Brannon introduced Jensen to Weldon Hays, who owned Lancaster First Federal Savings and Loan (Lancaster) in Colony, Texas. Jensen met with Hays' father, James Hays, to discuss the purchase of that institution.

Brannon also introduced Jensen to David Faulkner, a real estate developer, and Jim Toler, a real estate developer and former mayor of the City of Garland. Those two men were involved in the development of real estate projects in an area known as the I-30 corridor in Dallas, Texas. To attract participants for the various projects, Faulkner would arrange elaborate Saturday morning breakfast meetings where high profile individuals and dignitaries would meet with the investors and developers. Faulkner and Toler bought large tracts of land and sold them to "investors," "builder-investors," or "builder-developers" at inflated prices. United States v. Faulkner, 17 F.3d 745, 752 (5th Cir.), cert. denied, __ U.S. __, 115 S.Ct. 193 (1994).[1] The property would then change hands in a series of "land flips" which were frequently on the same day. Id.

After meeting with Faulkner and Toler, Jensen moved to Texas and became involved in funding the loans for the projects in the I-30 corridor. Jensen set up an office in Dallas, and employed Tim

---

[1] Faulkner provides a most comprehensive recitation of the parties and the circumstances involved in this immense scheme.

Jensen, Bjornar Fredricksen, loan processors Ellen Burns and Kateland Curly, and accountant Jay Housley. Additionally, Jensen operated several entities which obtained financing for the I-30 corridor projects, including Antum Financial Corporation, Mountain West Mortgage, Snowball Investment Corporation, and Helaman Investment Corporation.

The loans made in connection with the I-30 development were provided by federally insured institutions: Lancaster and Bell Savings (which were controlled by Jensen); and Empire Savings and Loan (which was controlled by Spencer Blain). The borrowers, however, did not necessarily have to be financially qualified to take out these loans.

Faulkner referred individuals to Clifford Sinclair to put together loan packages for the condominium deals. Sinclair and Mike Faldmo[2] were associated with a company called Kitco. Kitco would put together these packages for the borrowers. Faldmo testified that Toler and Faulkner would acquire the land and then decide how much money needed to be made out of a transaction. The personnel at Kitco would calculate the valuation amount of the land necessary to generate the cash requested. The Kitco employees would contact the appraisers and advise them of the needed amount per square foot. The personnel at Kitco would assist the borrowers in preparing the financial statement. The personnel would use false tax returns to insure the borrowers would qualify for the

---

[2] Faldmo testified for the government and had previously plead guilty.

loans.   The borrowers would receive "rebates" or "kickbacks" at closing.   Frequently, the properties would undergo "land flips" on the closing date among intermediate buyers and others who were designated to make money on the ultimate loan taken by the last purchaser.   Faldmo testified that the deals were not driven by market demand but rather, they were based on the amount available to be loaned.

LANCASTER SAVINGS AND LOAN

To obtain control of Lancaster, Jensen purchased the resignations of the board of directors for $150,000 pursuant to an agreement.   The board members signed undated letters of resignation, which Jensen never exercised.   Jensen was named chairman of the board, and Hays introduced Jensen to the employees of Lancaster as the new boss.   After acquiring control of Lancaster, Jensen and his companies continued brokering loans to Lancaster.   Jensen also taught the Lancaster personnel how to obtained brokered funds.[3]   Jensen testified that the brokers were anxious to do business with Lancaster because it was federally insured.   Jensen instructed Carole Harris, Hays' secretary, "how much money" to order on a certain day and "how high to negotiate rates."   Numerous such brokered funds transactions were conducted

---

[3]   A "brokered funds" transaction was described at trial as follows.   "If I had a million dollars I would break my million dollars up into ten $100,000 investments.   And rather than myself calling to savings and loans and banks all around the country, I would call a local brokerage house who would, in turn, know who was paying the best interest rates at banks and savings and loans for me to invest my money and they would invest it for me for a commission."   A brokered funds transactions in and of itself was legal.

from out of state using wire transfers to Lancaster in $100,000 increments. Jensen hired Charles Brizius as executive vice-president of Lancaster in November 1982. Brizius was an experienced savings and loan executive and was to implement policies and procedures. Brizius testified that he examined the loan files and discovered that the loans were poorly underwritten and much documentation was missing. Brizius also noticed that fees were being paid to companies affiliated with Jensen, and so Brizius confronted Jensen and informed him that there was a conflict of interest for the institution to fund loans with fees paid to entities controlled and owned by Jensen. Brizius further explained that affiliated party transactions required approval of the Federal Home Loan Bank Board. Jensen expressed surprise and indicated that he was not aware of the regulation on conflicts of interest. Brizius testified that Jensen's surprise appeared sincere. As a result of this conversation, Jensen resigned as chairman of the board of Lancaster. Jensen was made an advisory director.[4] Brizius further recommended that no further loans be funded until he returned from his Christmas vacation. Contrary to that advice, Lancaster funded the Oates Corners project, a multi-million dollar transaction, in Brizius' absence.

During Lancaster's annual audit in 1982, Kenneth Stein, an auditor, noticed that the assets had grown at an "unusual" and "very fast" rate: from $17,000,000 (August) to $55,000,000

---

[4] Jensen testified that initially he was not aware that the board had made him an advisory director.

(September) to $105,000,000 (December). Stein and the other auditors became very concerned about: loans in apparent violation of the limit to individual borrowers; potential conflicts of interest; concentrations of credit in the I-30 corridor; the validity of appraisals made in such a short period of time prior to purchase; and whether the transactions were at arms' length.

In December of 1982, the Federal Home Loan Bank Board conducted an examination of Lancaster. An examiner asked Jensen about the brokerage fees received by companies owned by Jensen. Jensen responded that after he learned that such an affiliation was inappropriate, he separated himself from those institutions and resigned as chairman of the board at Lancaster. Jensen wrote a letter stating that he had no <u>interest</u> in either Snowball or Helaman. The evidence, however, showed that Jensen did receive proceeds from Snowball and Helaman. Jensen testified that his attorney drafted that letter and that, according to his attorney's advice, he understood that he had no <u>conflict of interest</u> because he was not an officer or a director.

In early 1983, a meeting was held to discuss the conversion of Lancaster from a mutual institution to a stock institution. During that meeting, Jensen revealed that he had purchased the resignation of the board of directors. Brizius was concerned because no application for change of control had been filed with the Federal Home Loan Bank Board. The Federal Home Loan Bank Board was then notified, and Lancaster's board was neutralized by bringing in outside directors. Jensen was then removed as an advisory

-6-

director.

BELL COUNTY FEDERAL SAVINGS AND LOAN

In September 1982, Jensen met with Kenneth Law, a lawyer and the president of Bell Savings and Loan, to discuss the acquisition of Bell. Jensen again represented that he was a medical doctor. An oral agreement was reached in which Jensen, James Hays, and Weldon Hays would purchase Bell's outstanding stock subject to the approval of the Federal Home Loan Bank Board.

While the application for change of control was pending, Law requested that Jensen buy some stock that certain Bell shareholders wanted to sell. Law advised Jensen that he could not put the stock in his own name so Jensen bought the stock in the name of other persons. Jensen told Law that he was interested in funding some loans in the five to ten million dollar range, and Law informed him that Bell did not have that amount of money to loan. Jensen responded that was not a problem and suggested brokering funds. Jensen then ran an ad for Bell offering rates on jumbo certificates of deposit and instructed the personnel how to offer brokered funds. Jensen indicated to personnel at Bell the amount of money needed for a project, and they would receive the money through brokered funds transactions. Law testified that Bell had no reason to take these brokered funds except to fund the large loans brought by Jensen.

Law examined the loan documents and found them to be incomplete. Law advised Jensen of the problem and Jensen responded that his people would take care of it. Certain remarks Jensen had

made gave Law the impression that Jensen owned or was connected with a company that received proceeds funded by Lancaster. Consequently, Law told Jensen that, as an owner of a savings and loan, he could not receive money other than the brokerage fees. Jensen assured Law that he understood and that it would not happen at Bell.

Subsequently, Law began to suspect that Jensen was secretly taking money from the projects. Because of those suspicions, Law and Brizius went to the scheduled closing of a project named Tiffany Cove. Jensen was out of state at the time, and Fredricksen represented him at the closing. None of the borrowers appeared at the closing. Law and Brizius then called the borrowers involved in the Tiffany Cove project to determine whether they were to receive money from the deal. They also talked to the Dallas Title Company to determine whether the property was changing hands. As a result of these conversations, Law and Brizius called Jensen and told him that they "were satisfied that he lied to us," and they were not going to fund the transaction. They also told Jensen that Fredricksen admitted that he was to receive $150,000 of the proceeds, that the loan was going through three or four different hands, and that the borrowers were to receive cash from the proceeds. This information had been concealed because it was not on the borrower's statement, it was on another disclosure statement.

In March 1983, the board of directors of Bell terminated the agreement in which Jensen, Weldon Hays, and James Hays were to

acquire the Bell stock.  Law and others borrowed the money to buy back the stock Jensen had purchased.

In his defense, Jensen testified that he did not realize he was violating any regulation or law.  He was relying on the advice of his attorneys and other individuals who he believed had more expertise in the area of savings and loans.

## RESULT OF LOANS

During 1982 and 1983, loans totaling over 300 million dollars were made on the real estate projects in the I-30 corridor.  Of that amount, Jensen received approximately $25,000,000.[5]  The Federal Deposit Insurance Corporation suffered financial losses totaling $327,942,431, in connection with the above scheme.  As a result of the above activities, an 88-count indictment was filed charging Jensen and seven other defendants with numerous offenses.  Ultimately, Jensen was severed from the other defendants and tried on 18 counts of the indictment.  The jury found him guilty on all the following 18 counts:  count 1, conspiracy (18 U.S.C. § 371); counts 7, 15, 22, 24, 27, and 36, fraudulent participation in loan monies and false entries (18 U.S.C. § 1006); counts 14, 16, 21, and 23, fraudulent misapplication of bank funds (18 U.S.C. § 657); counts 52, 53, 65, and 66, wire fraud (18 U.S.C. § 1343); counts 84 and 85, interstate transportation of property taken by fraud (18 U.S.C. § 2314); and count 88, RICO conspiracy (18 U.S.C. § 1962(d)).

---

[5]    In one real estate transaction, Jensen received a $4,000,000 mansion for what he termed as "equity participation."

-9-

The court sentenced Jensen to: 5 years on count 1; 5 years on counts 7, 15, 22, 24, 27, and 36 (concurrent to each other but consecutive to count 1); 5 years on counts 14, 16, 21, and 23 (concurrent with each other and the preceding group, but consecutive to count 1); 5 years on counts 52, 53, 65, and 66 (concurrent with each other and the preceding two groups, but consecutive to count 1); 10 years on counts 84 and 85 (concurrent to each other and concurrent with the preceding three groups but consecutive to count 1); and 20 years on count 88 (concurrent with all counts). The court, pursuant to the jury's finding, entered an order of forfeiture against Jensen in the amount of $23,000,000.

## II. THE DISTRICT COURT'S DENIAL OF JENSEN'S REQUEST FOR CERTAIN JURY INSTRUCTIONS

Jensen contends that the district court erred in refusing his request for a jury instruction to limit the use of evidence regarding extrinsic offenses for purposes of impeachment. He also contends the district court erred in refusing his request for an instruction on his theory of the case.

A trial court's refusal to include a requested instruction in the jury charge is reviewed under an abuse of discretion standard, and the court is afforded substantial latitude in formulating its instructions. United States v. Rochester, 898 F.2d 971, 978 (5th Cir. 1990). Refusal to include an instruction constitutes reversible error only upon the occurrence of all three of the following conditions: (1) the requested instruction is substantially correct; (2) the actual charge given to the jury did not substantially cover the content of the proposed instruction;

-10-

and (3) the omission of the instruction would seriously impair the defendant's ability to present his defense. <u>United States v. Daniel</u>, 957 F.2d 162, 170 (5th Cir. 1992).

Jensen contends that the court erred in refusing his requested instruction which limited the jury's use of certain evidence of extrinsic offenses to purposes of impeachment.[6] Jensen identifies the following evidence which he contends required the limiting instruction: (1) evidence regarding false statements he provided on a bankruptcy document; (2) a false tax return; and (3) false loan documents.

Jensen relies on Rule 105 of the Federal Rules of Evidence which provides that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

Jensen requested the following instruction:

> [Y]ou have heard evidence concerning alleged false statements made by the Defendant concerning matters separate from those alleged in the Indictment. The Defendant is not charged with an offense for making these statements. You should not find him guilty of the charges in this Indictment based upon his allegedly making those statements.

The trial judge denied Jensen's request for the limiting

---

[6] Jensen acknowledges that the district court apparently admitted this evidence pursuant to Rule 608(b) of the Federal Rules of Evidence, which provides that the trial court, in its discretion, may allow inquiry of specific instances of conduct during cross-examination concerning the witness' character for truthfulness.

instruction, stating that he thought it was "covered." In pertinent part, the court's charge provided as follows:

The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, that is inconsistent with the witness's testimony at this trial. If you believe that a witness has been discredited in this or any other manner, you are to give this testimony such weight as you may think it deserves.

\* \* \*

You are to determine the guilt or innocence of the defendant from the evidence in this case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment.

The instruction requested by Jensen was substantially covered in the charge given to the jury. Therefore, the trial court did not abuse its discretion in denying the limiting instruction requested by Jensen.

Jensen also contends that the trial court erred in denying the requested jury instruction on his theory of the case. Specifically, Jensen requested the following instruction:

Mr. Jensen's theory of the defense is that he did not wilfully violate any of the laws he's charged with violating. Mr. Jensen's defense is that the Government has failed to prove beyond a reasonable doubt that he knowingly and wilfully did an act which the law forbids with the intent to violate the law. If you believe that the Government has failed to prove beyond a reasonable doubt that Mr. Jensen wilfully and knowingly did acts, which the law forbids, with the intent to violate the law, you must find Mr. Jensen not guilty.

The district court did not abuse its discretion in refusing to submit the above instruction because the charge properly set forth the government's burden of proving the defendant guilty beyond a

-12-

reasonable doubt. Further, as the government asserts, the charge defines the terms "knowingly," "willfully," and "intent to defraud."[7] See United States v. Cartwright, 6 F.3d 294, 302 (5th Cir. 1993) (district court did not err in refusing requested instruction on presumption of innocence because instruction was substantially covered by charge given to jury), petition for cert. filed, (U.S. July 19, 1994) (No. 94-5410). The requested instruction was substantially covered by the charge given to the jury. Moreover, Jensen has not demonstrated that his ability to present his defense was impaired. Consequently, the refusal of the requested instructions did not constitute an abuse of discretion.

### III. SUFFICIENCY OF THE EVIDENCE

Jensen contends that the evidence is insufficient to support his convictions. He contends that although the evidence shows that he received money from loan proceeds that he should not have received, the evidence is insufficient to prove that he acted willfully or with the intent to defraud. When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government with all reasonable inferences and credibility choices to be made in support of the jury's verdict. United States v. Salazar, 958 F.2d 1285, 1290-91 (5th Cir.), cert. denied, __ U.S. __, 113 S.Ct. 185 (1992). The evidence is sufficient to support a

---

[7] The instructions on the terms "knowingly" and "willfully" follow those approved in this circuit. See United States v. St. Gelais, 952 F.2d 90, 93-94 (5th Cir.), cert. denied, __ U.S. __, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992); Rochester, supra.

conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  <u>Id.</u> The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. <u>Faulkner</u>, 17 F.3d at 768.

Jensen does not dispute that "[t]he evidence at trial showed various acts by different persons that were fraudulent and illegal."  Nevertheless, Jensen claims that "the evidence wholly failed to prove that Mr. Jensen was aware of the illegality of these acts by other persons."  In other words, Jensen simply challenges the sufficiency of the evidence proving his intent or mental state, but does not challenge any of the other elements of his 18 convictions.

To prove a conspiracy, the government must show that an agreement between two or more persons to violate the law, that the defendant had knowledge of the agreement, and that the defendant voluntarily participated in the conspiracy.  <u>United States v. Casilla</u>, 20 F.3d 600, 603 (5th Cir.), <u>cert. denied</u>, __ U.S. __, 115 S.Ct. 240 (1994).  Each element of a conspiracy may be inferred from circumstantial evidence.  <u>Id.</u>  The agreement may be inferred from a "concert of action."  <u>Id.</u> (citation omitted).  "Once the government has produced evidence of a conspiracy, only `slight' evidence is needed to connect an individual to that conspiracy." <u>Id.</u> (quoting <u>United States v. Duncan,</u> 919 F.2d 981, 991 (5th Cir.

-14-

1990), <u>cert. denied</u>, 500 U.S. 926, 111 S.Ct. 2036 (1991)). "Knowledge of a conspiracy and voluntary participation in a conspiracy may be inferred from a `collection of circumstances.'" <u>Id.</u> (citation omitted).

The evidence at trial was largely undisputed. In fact, it was undisputed that Jensen received approximately $25,000,000 in a matter of months from the transactions at issue. From the beginning of trial, the defense focused the jury on the issue of whether Jensen had the intent to commit the charged offenses. During opening statement, defense counsel argued as follows:

> Now, I don't mean to imply and I don't want to mislead you. I'm not trying to tell you that the things that Paul did were all right. Paul Jensen took some money. He took a lot of money out of these savings and loans, out of these deals that were -- that he took in violation of laws and regulations. He should not have taken that money. There is no question about that. That is not the issue of this case. Don't -- don't waste one second worrying about that because we can set that aside right now. Paul Jensen took money that he should not have taken.

> As I said before, that's not what this case is about. The question is: Did he know that he was taking money he should not have taken. . . .

> *    *    *

> The Government's evidence is going to show, and this is another thing that is totally uncontested, there was a conspiracy. The conspiracy involved Faulkner, Toler, Blain, Clifford Sinclair and others. And this was a conspiracy that was going on long before Paul Jensen ever came to Dallas. It is a conspiracy that continued after he left Dallas. That is not an issue in the case. These people were engaged in illegal activity. There is no question about that.

> The question is: Did Paul [Jensen] willfully and knowingly engage in illegal activity with those people? The answer to that is no. So don't worry about trying to decide whether there's something illegal going on.

-15-

Faulkner, Toler, Blain, Sinclair, they're all doing things that are illegal. That's not the question for this trial.

Jensen was a central figure in this scheme. As the government asserts, Jensen personally participated in the planning of the deals when he negotiated the high points for his mortgage companies and instructed the personnel at Lancaster and Bell how to obtain brokered funds to have money available to loan on the various real estate projects. He purchased the resignation of the board of directors at Lancaster to gain control of that institution. Jensen gained control of both Lancaster and Bell to finance these projects. Without the funding Jensen organized, the scheme would not have been possible or at least not on such a grand scale. In addition, his actions were accompanied by deceit and misrepresentations. For instance, although Jensen still received proceeds from Snowball and Helaman, he represented to the Federal Home Loan Bank Board that he had no interest in either company. Jensen knew that the mortgage companies were receiving high points without the proper underwriting, that buyers were receiving "upfront" money or "kickbacks," and that the property would undergo a series of "land flips" at inflated prices on the day of closing. As a result of these intermediate transactions, Jensen received millions of dollars in loan proceeds.

Although Jensen testified at length regarding his lack of intent to defraud, the jury obviously did not believe him. Intent to defraud was properly before the jury for a factual determination. After a review of the record, we conclude that a

rational jury could have inferred Jensen's knowledge of and participation in the conspiracy beyond a reasonable doubt.

Jensen also blanketly contends that the evidence is insufficient to demonstrate that he had the requisite intent regarding the substantive counts. However, "under the <u>Pinkerton</u> rule `[a] party to a conspiracy may be held responsible for a substantive offense committed by a coconspirator in furtherance of a conspiracy, even if that party does not participate in or have any knowledge of the substantive offense.'" <u>Faulkner</u>, 17 F.3d at 771 (quoting <u>United States v. Garcia</u>, 917 F.2d 1370, 1377 (5th Cir. 1990)). Accordingly, because we have determined that Jensen's conspiracy conviction should stand, Jensen may be held responsible for any substantive offenses committed by coconspirators in furtherance of the conspiracy regardless whether he had knowledge of or participated in the substantive offenses.

Jensen does not challenge any element of the substantive convictions except for his requisite mental state. Again, Jensen's intent was a question for the fact finder. We find there is sufficient evidence to support the jury's conclusion that Jensen had the requisite mental state to commit the substantive offenses.

## IV. WHETHER PROOF WAS OF ONE OR MANY CONSPIRACIES

Jensen claims the government failed to prove that one conspiracy existed as charged in the indictment. He claims that the evidence introduced demonstrated multiple conspiracies rather than the single overarching conspiracy alleged in count one, resulting in a material variance that prejudiced his substantial

rights.

When reviewing a claim of fatal variance, we will reverse only if the evidence at trial varied from what the indictment alleged, and the variance prejudiced the defendant's substantial rights. Faulkner, 17 F.3d at 760. The following factors are considered to determine whether one or multiple conspiracies existed: (1) a common goal; (2) the nature of the scheme; and (3) an overlapping of participants in the various transactions. Id. at 761.

Jensen has not set forth with any specificity the facts necessary to support his claim that more than one conspiracy existed or that there was a material variance between what was charged and the facts adduced at trial. Nevertheless, as in Faulkner, the evidence at Jensen's trial demonstrated that the defendants "shared a common goal of enriching themselves by profiting from the leveraged selling and reselling of real estate along I-30." 17 F.3d at 761 (citing United States v. Richerson, 833 F.2d 1147, 1153 (5th Cir. 1987)). Likewise, "[t]he nature of the scheme was such that different participants played different but important functions necessary to its success." Id. As for the third factor, Jensen implicitly acknowledges that there were overlapping participants in the various transactions when he states that the existence of common participants does not demonstrate only one conspiracy.

Assuming arguendo that more than one conspiracy existed, Jensen is not entitled to relief. In Faulkner, we concluded "that where the indictment alleges a single conspiracy and the evidence

-18-

established each defendant's participation in at least one conspiracy a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance." 17 F.3d at 762. Jensen was tried separately, and thus, the jury could not have been confused as to compartmentalizing evidence against other defendants. Jensen has not shown improper joinder or severance.

**V. COMMISSION OF PREDICATE ACTS UNDER RICO STATUTE**

Jensen was convicted of conspiring to violate the RICO statute, 18 U.S.C. § 1962(d), as alleged in Count 88 of the indictment. Jensen claims insufficiency of the evidence, contending that the law of this Circuit requires the government to prove that a RICO conspirator, and thus Jensen himself, agreed to personally commit two racketeering acts.[8]

The court below instructed the jury that the evidence must show beyond a reasonable doubt:

> That at the time the Defendant knowingly and wilfully agreed to join in such conspiracy, he did so with the specific intent either to personally participate in the commission of two "racketeering acts," as elsewhere defined in these instructions, or that he specifically intended to otherwise participate in the affairs of the enterprise with the knowledge and intent that <u>other members</u> of the conspiracy would commit two or more "racketeering acts" as a part of a "pattern of racketeering activity."

---

[8] Jensen cites, <u>inter alia</u>, the following cases: <u>United States v. Elliott</u>, 571 F.2d 880 (5th Cir.), <u>cert. denied</u>, 439 U.S. 953, 99 S.Ct. 349 (1978); <u>United States v. Martino</u>, 648 F.2d 367 (5th Cir. 1981), <u>cert. denied</u>, 456 U.S. 943, 102 S.Ct. 2006 (1982).

(emphasis added).[9]

The government argues that we have not definitely resolved the personal agreement argument presented by Jensen,[10] and urges us to resolve it in favor of the majority of the Circuits that require only that there is evidence of an agreement that members of the conspiracy will commit two proscribed acts.

Faulkner controls the disposition of this insufficiency claim. There, we held that regardless whether the conviction for conspiracy to violate RICO required the defendant to agree to personally commit two predicate acts or only that he agree with the other conspirators that two predicate acts be committed pursuant to the conspiracy, the RICO conviction was supported by the jury's finding that each had committed the requisite predicate acts. 17 F.3d at 774. Likewise, in this case, the jury found Jensen guilty of four counts of wire fraud (counts 52, 53, 65, and 66). There is sufficient evidence to support the wire fraud convictions, which are racketeering acts. Jensen is not entitled to relief on this claim, and we need not resolve the personal agreement argument presented by Jensen.

## VI.   EXTRINSIC OFFENSES

Jensen argues that the district court erred in allowing the government to cross-examine him regarding three extrinsic offenses.

_____

[9]   Additionally, the court below instructed the jury that it was not to find Jensen guilty unless it unanimously agreed that he committed at least two particular racketeering acts.

[10]   The government cites United States v. Neapolitan, 791 F.2d 489, 496 n.3 (7th Cir.), cert. denied, 479 U.S. 940, 107 S.Ct. 422 (1986).

-20-

The extrinsic offenses involved false statements he made on a bankruptcy document, a false tax return he provided in connection with the purchase of a car, and submission of false loan documents concerning a project called Riverbend. He also contends that the admission of evidence regarding those extrinsic offenses was error.[11] This Court reviews evidentiary rulings for abuse of discretion. <u>United States v. Lopez</u>, 979 F.2d 1024, 1032 (5th Cir. 1992), <u>cert. denied</u>, __ U.S. __, 113 S.Ct. 2349 (1993).

Both parties agree that the district court apparently admitted the impeachment evidence pursuant to Rule 608(b) of the Federal Rules of Evidence, which provides as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . concerning the witness' character for truthfulness or untruthfulness . . . .

Jensen, however, argues that the cross-examination regarding the extrinsic offenses should not have been allowed because the probative value was substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. We disagree. As the government argues, the evidence regarding false statements made by Jensen was probative of his character for untruthfulness as contemplated by Rule 608(b). He has not shown that the court abused its sound discretion in allowing such examination.

---

[11] Regarding the false loan documents connected with the Riverbend project, the government only questioned Jensen; it did not introduce the documents into evidence.

-21-

Moreover, as discussed below, this testimony was probative to rebut Jensen's defense theory that he was an innocent dupe and without an intent to defraud.

Jensen also argues that the district court erred in admitting into evidence the documents showing his previous false statements. As quoted above, Rule 608(b) <u>prohibits</u> proof of specific instances of the conduct of a witness for the purpose of attacking the witness' credibility. The documents were not admissible into evidence under Rule 608(b).

That is not the end of the inquiry, however. If the evidence was admissible on any ground, the district court's reliance on other grounds does not affect the defendant's substantial rights. <u>United States v. Blake</u>, 941 F.2d 334, 339 (5th Cir. 1991), <u>cert. denied</u>, __ U.S. __, 113 S.Ct. 596 (1992). In part, Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

The evidence introduced regarding Jensen's intentional false statements and misrepresentations was admissible under Fed.R.Evid. 404(b) to prove Jensen's knowledge of the fraud. As the government asserts, Jensen's defense was that he lacked a culpable state of mind and did not intentionally mislead people. Under Rule 404(b), the government properly introduced the evidence to rebut Jensen's defense of lack of intent. Jensen has not shown that his substantial rights were prejudiced.

-22-

## VII. WHETHER EVIDENCE WAS RELEVANT

Jensen next contends the district court erred in admitting into evidence testimony that he purported to be a medical doctor and testimony regarding how he spent the money he acquired through the loan transactions at issue. Jensen contends that the evidence was not relevant under Fed.R.Evid. 401, and further, any probative value was outweighed by the danger of prejudice.

Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Clearly, the challenged evidence was relevant as it tended to prove Jensen's efforts to take control of the lending institutions and to further the overall fraudulent scheme of the defendants. Additionally, in regard to the evidence of large expenditures of money, such evidence is relevant to prove the funds were obtained illegally when "a defendant is on trial for a crime in which pecuniary gain is the usual motive for or natural result of its perpetration and there is other evidence of his guilt." United States v. Chagra, 669 F.2d 241, 256 (5th Cir.), cert. denied, 459 U.S. 846, 103 S.Ct. 102 (1982). Jensen has failed to show that the admission of the evidence was improper.

Moreover, after the introduction of the evidence, the district court orally instructed the jurors as follows:

> There was testimony concerning statements that were allegedly made by the Defendant that he was a doctor. There was testimony concerning money, large sums of money that were spent. I just want to emphasize to you the

-23-

Defendant's not being charged in this case with making misrepresentations that he was a doctor. He's not being charged with spending a lot of money. He's charged with bank fraud, conspiracy to commit bank fraud and the other crimes that were described to you. So I'm cautioning you that on that evidence I don't want you to go back in the jury room during deliberation and say we're going to find Mr. Jensen guilty because he represented that he was a doctor and that he spent a lot of money. That's not what he's charged with.

Assuming arguendo the evidence was erroneously admitted, it did not affect Jensen's substantial rights given the court's oral instructions.

## VIII. DISTRICT COURT'S FAILURE TO MAKE EXPLICIT FINDINGS REGARDING THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS.

Jensen, relying on United States v. Powell, 973 F.2d 885 (10th Cir. 1992), cert. denied, __ U.S. __, 113 S.Ct. 1598 (1993), contends that the district court erred in failing to make explicit findings regarding the admissibility of the co-conspirator statements.

The government does not deny that the district court failed to make any findings as to the predicate facts pursuant to Rule 801(d)(2)(E). Instead, the government argues that the omission was harmless. In United States v. Fragoso, 978 F.2d 896, 900-01 (5th Cir. 1992), cert. denied, __ U.S. __, 113 S.Ct. 1664 (1993), we determined that, in denying the defendant's motion for directed verdict of acquittal, the district court implicitly had found sufficient evidence to establish a conspiracy. We therefore reasoned that the error was harmless. Likewise, in the case at bar, the court denied Jensen's motion for directed verdict of acquittal. We must follow the decision of the prior panel in

-24-

<u>Fragoso</u> and accordingly, reject Jensen's claim.

## IX. DISTRICT COURT'S DISMISSAL OF A PROSPECTIVE JUROR

Jensen contends that his right to a fair trial under the Sixth Amendment was violated when the district court erred in sua sponte dismissing a prospective juror because the court found her not competent to be on the jury. The Sixth Amendment guarantees a criminal defendant the right to a trial by impartial jury and the trial judge is entrusted with the implementation of this guarantee. <u>United States v. Hinojosa</u>, 958 F.2d 624, 631 (5th Cir. 1992). We will not disturb a trial court's determinations of impartiality absent a clear abuse of discretion. <u>Id.</u>

During voir dire, the follow colloquy transpired:

[COURT:] Now, I want to make absolutely sure that I've covered anything that you want to tell me about whether or not you should be on the jury. Sometimes I may fail to ask questions that somebody may have a concern in their mind. I'm going to ask the lawyers to come back up. And if any of you have anything you want to tell me in confidence at the bench about whether or not you should serve on this jury now is your time just to come up. I'm talking about personal feelings, publicity, business reasons, just any other reason. If there's anything at all if you would just raise your hand and just come up to the bench.

(Side bar)

THE COURT: Just come right up here?

A JUROR: This building, I can't handle the air in this building.

THE COURT: The air?

A JUROR: Smokers I tried to get -- except they didn't do it.

THE COURT: You seem to be having trouble since we got here today?

-25-

A JUROR:  Yes, it is worse.

THE COURT:  Today?

A JUROR:  Because of the cold air.  I'm not used to cold air on me.

THE COURT:  I'm just going to excuse you from further jury service.

*     *     *

(Juror leaves side bar)

THE COURT:  I'm going to excuse that juror on the Court's own motion.  If there's any objection?

MR. UDASHEN:  Judge, I would object.  I don't think she gave a specific reason enough that -- of health reasons than maybe something the Court can do to alleviate her problem.

THE COURT:  Apparently you weren't looking at her or listening to her because there wasn't a word she said. It was the manner in which she was talking to me.  I don't think she's competent to be on the jury.  That's my specific finding.  This is the same juror that the Government wanted me to ask to come up because of the way she had been sitting in Court covered up from the time she got here.

Jensen argues "that it was improper for the Court to remove this juror over his objection without further inquiry into the alleged health problem," and "[w]ithout further inquiry the court did not have a sufficient basis to conclude that the juror was unqualified to sit on the jury."

In United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992), the trial court excused a juror who had called in sick and replaced her with an alternate juror.  The defendant objected because the court had failed to notify the parties of the excusal, which "depriv[ed] them of the ability to determine the nature of her illness and the length of time she would be unavailable."

-26-

Therefore, as in the case at bar, the defendant argued that his conviction should be overturned because there was an insufficient factual basis to excuse the juror. We rejected that contention and found no abuse of discretion.

Here, the trial court observed the actions and the demeanor of the prospective juror and expressly found her not competent to sit on the jury. Jensen has not shown that the basis for her excusal was a clear abuse of discretion.[12] Moreover, Jensen does not contend that any of the jurors on the panel were not impartial. As such, he has shown no basis for reversal of his convictions. See United States v. Prati, 861 F.2d 82, 87 (5th Cir. 1988).

## CONCLUSION

Accordingly, Jensen's convictions are AFFIRMED.

---

[12] See United States v. Coleman, 997 F.2d 1101, 1106 (5th Cir. 1993) (trial court may remove a juror when convinced that the juror's abilities to perform his duties have become impaired), cert. denied, __ U.S. __, 114 S.Ct. 893 (1994); United States v. Dumas, 658 F.2d 411, 413 (5th Cir. 1981), cert. denied, 455 U.S. 990, 102 S.Ct. 1615 (1982).