**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 99-30401

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RENARD SMITH,

Defendant-Appellant.

Appeal from the United States District Court
For the Eastern District of Louisiana
District Ct. No. 97-145L

June 30, 2000

Before POLITZ, EMILIO M. GARZA, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Renard Smith appeals his conviction and sentence for conspiracy to possess with intent to distribute cocaine hydrochloride in violation of 21 U.S.C. § 846. For the reasons set forth below, we affirm.

I

Between approximately 1992 and 1997, the Drug Enforcement Agency ("DEA") investigated the activities of Richard Pena, the leader of a drug-trafficking organization known as the "Pena organization." In 1997, Pena was arrested, and documents seized during his arrest—including a

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

phone log containing the names of Pena associates and family members—led DEA agents to David Singleton, an officer in the New Orleans Police Department ("NOPD"). Singleton's involvement with the Pena organization included kidnaping two individuals who were later murdered by other members of the organization and numerous drug transactions. In investigating Singleton, the DEA also received information that Renard Smith, also a New Orleans police officer and, for a period of time, Singleton's partner in the Special Operations Division, Narcotics Enforcement in Public Housing, Crime Prevention, had accompanied Singleton to the kidnaping of Richard Curtis.[1]

After further investigation into his involvement with the Pena organization, Smith was tried on a three-count indictment charging him with conspiracy to possess cocaine hydrochloride with intent to distribute,[2] kidnaping in aid of racketeering, and using a firearm in connection with a crime of violence. At trial, several government witnesses testified as to Smith's presence at, and/or participation in, various drug transactions. Smith was convicted of the conspiracy charge, but the jury could not reach an agreement as to the kidnaping and weapons charges. These charges were subsequently dismissed on the motion of the government. Smith was sentenced to life imprisonment, and he filed this timely appeal.

II

After the close of evidence, but before the case was submitted to the jury, the government requested that the court poll the jury to determine if any of the jurors was acquainted with any of the defense witnesses. The motion was motivated by the fact that a list of defense witnesses had been unavailable prior to trial, and because the government believed that one of the defendant's character witnesses, Bishop Paul S. Morton, had nodded to one of the jurors after he left the witness stand.

---

[1] Curtis was later murdered by members of the Pena organization.

[2] Count One of the indictment ("The Cocaine Conspiracy") charged, in part, that "[b]eginning at a time unknown, but prior to in or about April 1992, and continuing until on or about April 17, 1997. . . Renard Smith, a/k/a "Zoo", did knowingly and intentionally combine, conspire, confederate and agree with Richard R. Pena, Eduardo Pena, Johnny Pena, Jorge Rodriguez, David Singleton, and other persons known and unknown to the Grand Jury, to possess with the intent to distribute cocaine hydrochloride."

That jury member had been a congregant of Bishop Morton's for approximately three years. Although the juror told the court that her relationship with Bishop Morton would not affect her decision in the case, the judge removed her from the jury and replaced her with an alternate juror. In explaining his ruling, the judge stated:

> I've heard it, I looked at the lady as she testified under oath, testified before us here. I'm concerned frankly, that she is a member of the congregation. . . . And the person that she knew is an individual who took the stand and either during direct examination or cross examination, indicated that he believed the defendant.
>
> The defendant's position is diametrically opposed to the evidence. The question of credibility is a crux of this particular case. In order for this juror to find this defendant guilty, she must find that he lied. But not only that he lied, but that her pastor is either a poor judge of the people in his congregation or that he is wrong in some way, shape or form. And I know that she will try to do her best, but I think that it just seems to me that that burden on her is just an impossible one to bear.
>
> . . . And I think the fair thing to do, and I just feel after listening to the woman, after talking with her, I feel that the only fair thing to do is to exclude her for cause, and I am going to do so. And ask that [the alternate juror] take her place.
>
> . . . After listening to the witness and watching her demeanor, it's my view that it's imposing too great a burden for her. That's my ruling.

On appeal, Smith contends that the district court erred in removing the seated juror absent a finding that she was "unable or unqualified to perform her duties." Fed. R. Crim. P. 24(c)(1) ("An alternate juror, in the order called, shall replace a juror who becomes or is found to be unable or disqualified to perform juror duties."). We review a district court's decision to release a juror for abuse of discretion. *See United States v. Huntress*, 956 F.2d 1309, 1312 (5th Cir. 1992) ("[I]t is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties becomes impaired.") (quoting *United States v. Domiquez*, 615 F.2d 1093, 1095 (5th Cir. 1980)); *United States v. Rodriguez,* 573 F.2d 330, 332 (5th Cir. 1978) ("[T]he trial judge, in his *sound discretion*, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired.") (emphasis in original). "We will not disturb the trial judge's decision to release a juror unless we find that it prejudiced the defendant or another party. Prejudice occurs

in these circumstances when a juror is discharged without factual support or for a legally irrelevant reason." *Huntress*, 956 F.2d at 1312.

Here, the trial judge's removal of the juror fell within the wide range of discretion afforded him in the issue of juror replacement. *See United States v. Giarratano*, 622 F.2d 153, 157 (5th Cir. 1980). His statement explaining his release of the juror indicates a legitimate concern that the juror would be unable to remain impartial. This belief was based not only upon the juror's status as a member of Bishop Morton's congregation, but also on the judge's interpretation of the juror's demeanor when she testified that she would be able to render an impartial decision even in light of the Bishop-congregant relationship. *Cf. United States v. Ramos,* 71 F.3d 1150, 1153 (5th Cir. 1995) ("[W]e have only an insentient record before us. The trial court is in a far better position to judge the mood at trial and the predilections of the jury."); *Wicker v. McCotter*, 783 F.2d 487 (5th Cir. 1986) (holding that determinations of juror bias during voir dire are primarily made by the trial court because they "depend in great degree on the trial judge's assessment of the potential juror's demeanor and credibility, and on his impressions about that venireman's state of mind"). In light of the trial court's clearly-articulated factual basis for dismissing the juror, Smith is unable to demonstrate prejudice resulting from the removal. *See Huntress*, 956 F.2d at 1312.[3] Accordingly, we will not disturb the trial judge's ruling.

III

We next consider Smith's contention that there was insufficient evidence to support his conspiracy conviction. In reviewing the sufficiency of the evidence supporting a jury verdict, "we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses

---

[3] We also reject Smith's contention that Fed. R. Crim. P. 24(c)(1) mandates an express finding on the record that a juror is "unable or disqualified to perform juror duties." We have never before required such a finding, and Smith is unable to cite to any cases in which we require, or even suggest, that the propriety of a trial judge's dismissal hinges upon the language used in excusing a seated juror. To the extent that Rule 24 requires the judge to explain why he believes that an individual is unable to serve as juror in a particular case, the judge in this case has clearly done so.

beyond a reasonable doubt." *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995). In doing so, "[w]e must accept credibility choices that support the jury's verdict, and we may not reweigh the evidence." *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999) (internal citation omitted).

In order to establish a conspiracy, "the government must prove beyond a reasonable doubt that: (1) an agreement existed between two or more persons to accomplish unlawful ends; (2) the defendant had knowledge of the agreement; and (3) the defendant voluntarily participated." *United States v. Montgomery*, 210 F.3d 446, 449 (5th Cir. 2000). The agreement may be implicit such that the jury can infer its existence from circumstantial evidence. *See id.*; *see also United States v. Greenwood*, 974 F.2d 1449, 1457 (5th Cir. 1992) (holding that elements of a conspiracy can be proven by circumstantial evidence). Furthermore, in considering a conspiracy charge, "[t]he jury may rely on presence and association, along with other evidence[,] thus [] proof of an overt act in furtherance of the conspiracy is not required." *Montgomery*, 210 F.3d at 449. Smith concedes that the government proved the existence of a conspiracy, but argues that "the evidence regarding defendant's knowledge and participation in this conspiracy [] is unreliable, legally irrelevant and/or exceedingly sparse."

Here, several witnesses testified at trial that Smith was present during and/or a participant in, numerous drug transactions between 1992 and 1995. Pena's former girlfriend, Heather Watkins, testified that she first saw Smith one evening in 1995, when he met with Singleton and Pena in a park behind the Audubon Zoo. During that meeting, Watkins testified, Smith left his NOPD vehicle and spoke with Singleton and Pena. A few months later, Watkins delivered between seven and ten kilograms of cocaine for and picked up money from Singleton in a parking lot. During the transaction, Smith sat in the passenger seat of Singleton's car.

Next, Ernest Coleman testified that he received drugs from Singleton approximately once a month for three years. Coleman further testified that Singleton was a drug supplier for others, including Smith. Singleton told Coleman that Smith was a "delinquent payer." On two occasions, Coleman drove with Singleton to Smith's apartment to try to collect outstanding debts. Coleman

remained in the car while Singleton went up to Smith's apartment and collected what Coleman "assumed to be drug profits."

Edward Tyrone Yancey testified that in between 1992 and 1994, he did several "jack jobs" with Singleton and Smith.[4] Yancey stated that he would call Singleton and arrange for him to pull over another drug dealer in his car. Yancey would then take the dealers drugs and/or his money. On two occasions, when Yancey met Singleton to arrange a jacking, Smith was in Singleton's NOPD vehicle. Both officers subsequently stopped a designated vehicle and took the occupant's money. Yancey also testified that at one point, Smith gave him ten pounds of marijuana to sell.

Finally, Singleton testified that between 1992 and 1997, he and Smith were involved in numerous drug and money "jackings" as well as other drug transactions. He further stated that between 1995 and 1997, Pena supplied him and Smith with drugs that they, in turn, gave to other drug dealers to sell. Singleton also identified Smith's nickname on a drug ledger that had been seized by FBI agents at the time of his arrest.

Drawing all inferences in favor of the jury verdict and accepting the credibility determinations that support the jury's conviction, the totality of the evidence presented by the government is clearly sufficient for a rational juror to find, beyond a reasonable doubt, that Smith was not an innocent bystander, but rather that he knew of and voluntarily participated in a conspiracy to distribute cocaine. *See Cyprian*, 197 F.3d at 740.[5]

---

[4] A "jack job" involved Singleton and Smith stopping a drug dealer and taking either his drugs (for subsequent distribution) or his money.

[5] Smith contends that we should discredit all of the testimony linking him to the drug conspiracy because it "came from the testimony of confessed criminals, trading their testimony for favorable treatment from the government." Smith is correct that, at trial, the jury was informed that Watkins, Coleman, Singleton, and Yancey had each pleaded guilty to various charges arising out of activities with the Pena organization. The jury was also informed that the witnesses' plea agreements required full and truthful cooperation with the government in its case against Smith. "It is well settled, however, that a conviction may rest solely upon the uncorroborated testimony of an accomplice, even one who has chosen to cooperate with the government in exchange for leniency, as long as the testimony is not insubstantial on its face." *United States v. Posada-Rios*, 158 F.3d 832, 861 (5th Cir. 1998). Here, Smith fails to demonstrate that any of the witnesses testified to facts that they "could not possibly have observed or to events which could not have occurred under the laws of nature." *Id.* (defining what constitutes "incredible" testimony as a matter of law). Accordingly, we leave the

Smith next contends that a variance existed between the indictment, which alleged a single conspiracy, and the evidence adduced at trial, which established the existence of two separate conspiracies. Specifically, he contends that because Yancey was never linked to the Pena organization or the conspiracy charged in the indictment, his testimony concerning the two jack jobs and the marijuana sale related to a separate and uncharged conspiracy offense. We will reverse a conviction based upon a "fatal variance" only if "the evidence at trial varied from what the indictment alleged, and the variance prejudiced the defendant's substantial rights." *United States v. Jensen*, 41 F.3d 946, 956 (5th Cir. 1995).

A variance exists if the defendant was charged with one conspiracy, but the evidence at trial established multiple conspiracies. *See United States v. Pena-Rodriguez*, 110 F.3d at 1120, 1126 (5th Cir. 1994). In determining the number of conspiracies demonstrated at trial, we consider (1) the existence of a "common goal, (2) the nature of the scheme, and (3) an overlapping of participants in the various transactions." *Jensen*, 41 F.3d at 956.

Smith contends that the Pena organization and the "jack job conspiracy" had two separate goals; one that sought profit through selling cocaine, and another that sought profit through robbery. He further argues that the nature of the two schemes differed in that while "the Pena organization operated through a fairly complex system of couriers and dealers," the jack job conspiracy was of the "old-fashioned 'stick-up' variety." Finally, he contends that the participants in the two conspiracies did not overlap.

The government responds that the proof at trial demonstrates that (1) the co-conspirators had a common goal to "derive personal gain through drug-related activities," (2) the nature of the two schemes at issue was the same, and (3) there was sufficient overlap of participants in both plans given Singleton's key role in the two schemes. We need not, however, render a determination on the existence of a variance because even if one is assumed, we find that Smith is unable to demonstrate

task of assessing the credibility of the witnesses to the jury.

that any such variance affected his substantial rights. *See Pena-Rodriguez*, 110 F.3d at 1127 (pretermitting finding on existence of variance where defendants could not demonstrate effect on substantial rights); *see also Jensen*, 41 F.3d at 956 (holding that successful fatal variance claim required defendant to show both variance and effect on substantial rights).

We have "long held that when the indictment alleges the conspiracy count as a single conspiracy, but the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting the defendant's substantial rights." *Cyprian*, 197 F.3d at 741 (quoting *Pena-Rodriguez*, 110 F.3d at 1128). While this rule is not absolute, *see Pena-Rodriguez*, 110 F.3d at 1128, here, Smith fails to show that he falls outside the general rule. More specifically, because the government presented sufficient evidence to prove Smith's involvement with both the Pena organization and the jack job scheme with Yancey, Smith fails to show reversible error under joinder and severance principles. *See id.* at 1129 (instructing court to "look to the law of joinder and severance to determine whether the appellants' substantial rights were affected"); *see also United States v. Morgan*, 117 F.3d 849, 859 (5th Cir. 1997). Second, the evidence presented at trial was easy for the jury to understand such that we have little doubt that it was confused as to Smith's role in each scheme. *See id.* at 1129 (finding that fact that verdicts "did not turn on particularly complex evidence that was likely to confuse the jury" supported a finding that any alleged variance was not fatal). Given Smith's inability to prove that the alleged variance affected his substantial rights, his fatal variance claim must fail. *See Morgan*, 117 F.3d at 859; *Pena-Rodriguez*, 110 F.3d at 1129.

V

At trial, in response to a defense objection, the court limited Yancey's testimony to the time period of the charged conspiracy. Yancey then testified about both the jackings involving Smith and an occasion on which Smith asked him to sell ten pounds of marijuana. Relying on his contention that these alleged acts were not part of the Pena conspiracy, Smith now contends that Yancey's testimony

regarding these crimes was extrinsic evidence admitted in violation Fed. R. Evid. 404(b).[6]  We review the district court's decision to admit extrinsic evidence under Rule 404(b) for abuse of discretion.[7]  *See United States v. LeBaron*, 156 F.3d 621, 624 (5th Cir. 1998).   In doing so, we apply the two-prong test set out in *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978). "To be admissible, (1) the extrinsic evidence must be relevant to an issue other than the defendant's character and (2) the probative value of the evidence may not be substantially outweighed by undue prejudice." *United States v. Sharpe*, 193 F.3d 852, 868 (5th Cir. 1999) (citing *Beechum*, 582 F.2d at 911).

Smith argues that Yancey's testimony "served no legitimate purpose under Federal Rules of Evidence Rule 404(b)."  We disagree.  Yancey's testimony—which concerned other drug sales and thefts during the period in which the conspiracy was alleged to exist—was  relevant to prove both Smith's knowledge of the drug conspiracy and his intention to possess and distribute crack with Singleton.  *See* Fed. R. Evid. 404(b); *United States v. Wilwright*, 56 F.3d 586, 589 (5th Cir. 1995) ("It is settled in this Circuit that Rule 404(b) permits the admission of other crime evidence when a defendant places his intent at issue in a drug conspiracy case by pleading not guilty."); *see also United States v. Richardson*, 168 F.3d 836, 839 n. 9 (5th Cir. 1999) ("Even under the more stringent

---

[6]    Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

[7]    The government presents a persuasive argument that testimony regarding these crimes was not extrinsic but rather part of the charged conspiracy. We need not, however, resolve this question since, even assuming that such evidence was extrinsic, Smith is unable to show that it was (1) irrelevant and (2) more prejudicial than probative. *See Sharpe*, 193 F.3d at 868.

standard of abuse of discretion, we have frequently held that evidence of the defendant's extrinsic drug offenses is admissible, and that the probative value of such evidence is not substantially outweighed by its prejudicial effect.").[8]  Furthermore, Smith fails to argue, let alone prove, that the prejudicial effect of Yancey's testimony outweighed its probative value.  *See Sharpe*, 193 F.3d at 868; *Beechum*, 582 F.2d at 911.  Accordingly, the district court did not abuse its discretion in admitting Yancey's testimony.

VI

At Smith's sentencing hearing, the district court adopted the recommendation in the presentence report ("PSR") and set Smith's base level offense at forty-three.  The judge also, *inter alia*, denied Smith's objections concerning the amount of cocaine to be attributed to him and his request for a downward departure based upon Smith's minor role in the conspiracy.  He then imposed a sentence of life imprisonment.  We review the district court's interpretation and application of the sentencing guidelines *de novo*.  *See United States v. Gallardo-Trapero*, 185 F.3d 307, 323 (5th Cir. 1999).  We review the court's factual findings for clear error.  *See id.*

Smith first argues that the court erred in attributing to him the entire amount of cocaine attributed to the conspiracy where the evidence presented at trial could only support a finding that four kilograms of cocaine—the amount listed under Smith's nickname in Singleton's drug ledger—were specifically attributable to him.  The government responds that the entire 742 kilograms

---

[8]  Smith also argues that he "was given no notice whatsoever of the [government's] intention to use evidence of extrinsic crimes not related in anyway [*sic*] to the conspiracy charged."  *See* Fed. R. Evid. 404(b) (requiring the prosecution in a criminal case, upon request of the accused, to provide reasonable notice of the general nature of extrinsic evidence it intends to introduce at trial).    The government provided reasonable notice of its intention to introduce Yancey's testimony regarding the jackings in its "Notice of Intent to Introduce 'Similar Act' Evidence Pursuant to Rule 404(b)," which stated that the government would introduce evidence to show that "[d]uring the course of the conspiracy alleged in Count 1 of the Superseding Indictment, on 12 or more occasions, Smith and his co-conspirator David Singleton used their status as New Orleans Police Officers to extort and/or steal cocaine and/or money from other drug dealers."  To the extent that the notice may not have provided reasonable notice of the  government's intention to present testimony concerning the alleged requested marijuana sale, Smith fails to show, or cite case law to support, how—particularly in light of the trial court's clear instructions to the jury about the proper use of extrinsic evidence—he was prejudiced by the alleged lack of notice.

was foreseeable to Smith because he knew of the size and breadth of the Pena organization.

"In a drug conspiracy case, sentencing must take into account the drugs with which the defendant was directly involved but also those that can be attributed to him as part of his 'relevant conduct' under § 1B1.3 of the Sentencing Guidelines." *Id.* at 325. Relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly taken criminal activity." *Id.* (quoting United States Sentencing Commission, *Guidelines Manual*, § 3E1.1 (Nov. 1998)). Here, there is sufficient evidence in the record that Smith knew that Singleton was receiving large quantities of cocaine from Pena and that he was not the only member of the Pena organization. The government need not prove that Smith was aware of the exact quantity of drugs involved in the Pena organization, only that he could foresee the "general breadth" of the conspiracy." *See United States v. Duncan,* 191 F.3d 569, 576-77. Accordingly, the district court did not clearly err in determining that Smith could have reasonably foreseen the the full amount of cocaine attributable to the conspiracy for which he was convicted. *See Gallardo-Trapero*, 185 F.3d at 325 ("The district court's determination of relevant conduct is a factual finding that we review for clear error.").

Smith next contends that the district court erred in assessing his base level offense at forty-three. Sentencing in a drug conspiracy is guided by USSG § 2D1.1, which includes a cross reference providing that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place withing the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." *See* USSG § 2D1.1(d)(1). USSG § 2A1.1, in turn, provides simply "Base Offense Level: 43." In determining whether or not to apply a cross-reference in a conspiracy case, a district court must take into account "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3.

Here, the court determined that Smith, as a participant in a drug conspiracy, could reasonably foresee the murder of rival drug dealers like Curtis .[9] Such a finding is not clearly erroneous where,

---

[9]     In denying Smith's objection to the PSR, the district court found that there was:

a nexus between the kidnaping, murder, and drug conspiracy. Both

-11-

as here (1) there is substantial evidence that Smith participated in the kidnaping and delivery of Curtis to Pena, and (2) the kidnapings and murders are listed as activities related to the conspiracy in the indictment.

Lastly, Smith argues that the district court erred in declining to apply a downward departure from the sentencing guidelines based upon the minor role that Smith placed in the conspiracy. Under U.S.S.G. § 3B1.2(b), a district court must reduce a defendant's base level offense if the defendant was a "minor participant" in the crime for which he was convicted. *See* U.S.S.G. § 3B1.2(b). Here, where the evidence clearly indicates that Smith was as culpable as the average participant in the conspiracy—if not more so due to his employment as a police officer—the district court correctly determined that Smith failed to prove that his role in the conspiracy was minor. *See United States v. Brown*, 54 F.3d 234, 241 (5th Cir. 1995) (finding that defendant did not play minor role where he was not "substantially less culpable" than the average participant in the conspiracy); *id.* (holding that defendant bears the burden of proving his minor role in the offense by a preponderance of the evidence).

VII

For the foregoing reasons, we affirm Smith's conviction and sentence.

---

the kidnaping and murder occurred during the commission of the offense of conviction and are listed as activities of the cocaine conspiracy in Count 1 of the indictment. Furthermore, the murder was reasonably foreseeable as a result of the jointly undertaken criminal activity. The Court finds that because the murder was within the scope of the offense of conviction and with the authority provided by the sentencing guidelines the defendant's correct sentencing level of 43 is the murder guideline at U.S.S.G. 2A1.1.