# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 98-30759

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEON R. DUNCAN,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

September 29, 1999

Before POLITZ, JOLLY, and DUHÉ, Circuit Judges.

POLITZ, Circuit Judge:

Leon Duncan, formerly an officer with the New Orleans Police Department, challenges his conviction and sentence for violations of 21 U.S.C. § 846, conspiring to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1); and 18 U.S.C. § 924(c)(1), knowingly using and carrying a firearm during and in relation to a drug trafficking crime. Duncan was tried with a co-defendant, Darrel Jones, a reserve deputy sheriff, whose conviction and sentence are not at issue in this appeal. Finding no reversible error, Duncan's convictions and sentences are affirmed.

**BACKGROUND**

This case presents a dispiriting reality -- police corruption with officers prostituting themselves to facilitate criminal activities that they were duty-bound to eradicate. At least nine officers[1] were convicted of felonies. The only vaguely encouraging note one finds in this record is the comment by one of the officers involved in the criminal activity that none of the participants were "true blue policemen." Indeed!

In late 1993, a New Orleans crack cocaine dealer, Terry Adams, wearied of extortion by Police Officer Sammie Williams,[2] complained to the Federal Bureau of Investigation and agreed to assist their investigation. Williams quickly accepted Adams' request for paid protection for his drug-dealing activities and volunteered the services of fellow officer Len Davis. After several months, during which Williams and Davis guarded what they believed to be cocaine shipments at a warehouse, the FBI decided to expand its sting to rid the NOPD of potentially more pervasive illegality. At the behest of Adams and another undercover agent, who posed as a large dealer, additional police officers, including Duncan, were recruited to assist in the protection racket. Duncan, who had previously worked in the narcotics division of the NOPD, briefed the participants on how to avoid detection by federal agents and joined in persuading other law enforcement officials to become involved in the nefarious scheme.

---

[1]Eleven law enforcement officials were implicated.

[2]Williams testified that demanding money from drug dealers in exchange for protection was common among his fellow officers.

On November 18, 1994, armed and in full police uniform, Duncan, along with other law enforcement officials including co-defendant Jones, escorted supposed drug couriers while they loaded and transported in each of two vehicles what was purported to be twenty-five kilograms of cocaine. Five kilos in each vehicle were real; the remainder was sham. Duncan rode with two fellow officers and followed one of the vehicles. Another triumvirate of officers followed the other vehicle. The goal of the convoy was to ensure that no state or federal agent interfered with the drug deliveries. For their services, Duncan and the other police officers received several thousand dollars. Duncan made numerous incriminating statements, which were taped and played to the jury. After considering the evidence, including that graphically captured on tape, the jury rejected Duncan's defense -- that he thought he was working a security detail -- and convicted him of the offenses charged. He was sentenced to 295 months incarceration. On appeal he complains of the jury selection process and that his sentence was based on the attribution to his conduct of an excessive amount of drugs.

## ANALYSIS

### I. Jury Selection.

Duncan advances a multifaceted attack on the manner in which the jurors were chosen. He first contends that the trial court committed reversible error by denying his for-cause challenges to five members of the venire. He maintains that the error impinged on his sixth amendment right to an impartial jury because one of those challenged was selected to serve. He then asserts that the error forced him to use his peremptory challenges to strike

3

four members of the venire who should have been dismissed for cause, thereby contravening his rights under Fed. R. Crim. P. 24(b)[3] and his due process right thereto. Finally, he maintains that the trial court improperly denied two of his peremptory challenges -- one involving the juror whom he unsuccessfully attempted to remove for cause -- based on his analysis of the teachings of **Batson v. Kentucky**[4] and **Georgia v. McCollum**.[5] We address Duncan's claims seriatim.

### A.    For-Cause Challenges.

With respect to the for-cause challenges, our recent discussion in **United States v. Hall**[6] guides our resolution. There we summarized the applicable law as follows.

> The Sixth Amendment right to an impartial jury requires the exclusion of a potential juror if his views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. . . . [A] trial court's predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. As such, deference must be paid to the trial judge who sees and hears the [prospective] juror. We will only second-guess the court's decision that a juror is unbiased if there is an abuse of discretion. . . .
>
> [T]he loss of a peremptory challenge [does not] constitute[] a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end

---

[3]Rule 24(b) assigns the number of peremptory strikes to which the parties in a criminal case are entitled, in this case, ten for the defense and six for the prosecution.

[4]476 U.S. 79 (1986) (holding race-based use of peremptory strikes against jurors unconstitutional).

[5]505 U.S. 42 (1992) (extending **Batson** framework to criminal defendant's discriminatory use of peremptory strikes).

[6]152 F.3d 381 (5th Cir. 1998).

4

of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. . . . We have observed that, [w]hile peremptory challenges, or the number provided by Fed. R. Crim. P. 24(b) may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal. We have . . . held that [t]he denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice.[7]

Duncan asserts a sixth amendment violation with respect to one juror. We must reject his claim unless the trial court abused its discretion in determining that this juror's "views would [not] prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath."[8] Duncan questions the juror's ability to carry out her duties: she expressed a bias in favor of law enforcement witnesses over other witnesses.[9] On a prospective juror questionnaire she checked "yes" in response to the question whether she "[w]ould . . . give more weight to the testimony of a law enforcement witness than that of any other witness." During voir dire, she elaborated that she "was raised to respect authority[,] and [she] see[s] a law enforcement officer as an authority figure."

This response does not necessarily indicate a disqualifying bias. Indeed this view has been considered as reflective of "responsible citizenship and . . . not a ground to challenge

---

[7]**Id.** at 406-08 (internal quotations and citations omitted).

[8]**Wainwright v. Witt**, 469 U.S. 412, 424 (1985) (internal quotations omitted).

[9]Duncan now suggests that the juror had connections with a federal prosecutor through her sister and was acquainted with a trial assistant. This information was made known in the voir dire examination. No issue regarding same was raised in the trial court. We do not address it here.

[a] juror for charge."[10]   At most, such would offer a predicate for further voir dire, "depending on the issues in the case and the prospective witnesses."[11]  In the case at bar this was done.  On further examination the juror unambiguously affirmed that she would be fair and could reject the testimony of a law enforcement witness found to be lacking in credibility.  Finally, Duncan disregards a crucial distinction between this case and others – the government's case relied on the testimony of convicted felons.  We are persuaded that the trial court did not err in rejecting Duncan's sixth amendment challenge to this juror, nor did it abuse its discretion.[12]

Nor do we find any error or abuse of discretion in the trial court's rejection of Duncan's for-cause challenges to four other members of the venire.  A close reading of the voir dire examination of these four persuades us that the trial court ruled appropriately. None of the four demonstrated a disqualifying prejudice or bias.

### B.    Peremptory Challenges.

Duncan next contends that the trial court erred in its failure to allow two of his peremptory strikes.  The government objected to these challenges on the grounds that they were racially motivated.  Duncan, who is black, exercised ten peremptory challenges; nine of them were directed at white members of the venire.

---

[10]**Darbin v. Nourse**, 664 F.2d 1109, 1116 (9th Cir.1981) (Kennedy, J., concurring).

[11]**Id.**

[12]**United States v. Scott**, 159 F.3d 916, 925 (5th Cir. 1998).

In **United States v. Bentley-Smith**[13] after noting the constitutional bar against race-based peremptory strikes, we held that the district court's determination that a party has used peremptory strikes in a discriminatory manner is a finding of fact to be given great deference and to be accepted absent clear error. It is from this vantage point that we examine the trial court's rulings on the peremptory strikes and the arguments made by the defense and the government.[14]

A close reading of the relevant parts of the record of the voir dire examination reflects somewhat inapt references by the court about racial proportionality in the venire list, jurors selected, and peremptory challenges exercised, but the determinations made by the trial court were based on other, appropriate factors. Although we might not have made the same calls as the trial court in every instance, our review of the court's total reasoning as to each challenged juror leaves no doubt that neither error nor abuse of discretion exists as to any of the rulings advanced as error on appeal. We find no violation of Duncan's rights under Fed.R.Crim.P. 24(b), nor any due process rights in connection therewith.

## II. Drug Quantity.

Duncan contends that his sentence is based on a clearly erroneous drug calculation. The Presentence Report calculated his base level offense to be thirty-six under U.S.S.G. §

---

[13]2 F.3d 1368. Duncan argues that our review is de novo because the trial court committed legal error in applying **Batson**. We reject Duncan's argument and, under **Bentley-Smith**, review the trial court's rulings for clear error.

[14]We were impressed by the oral advocacy skills demonstrated by counsel, neither of whom was trial counsel.

2D1.1(c)(2), which assigns that base level for offenses involving fifty to one hundred fifty kilograms of cocaine.[15] The PSR attributed to Duncan fifty kilograms of cocaine -- the total amount of sham and real cocaine contained in the two vehicles in the convoy of November 18, 1994. The PSR reflects that Duncan was unsure as to the exact quantity of drugs, but concluded that he was aware that a significant amount was involved. Duncan objected to the latter finding and to the PSR's determination that he should be held accountable for the cocaine in both vehicles.

On appeal, Duncan insists that the trial court, in derogation of Fed. R. Crim. P. 32(c)(1), failed to make factual findings that the amount of cocaine attributed to him was reasonably foreseeable by him. Rather than make factual findings, Duncan complains that the trial court simply adopted the PSR. Any such finding, Duncan insists, would constitute clear error because the evidence established neither that he knew of the specific quantity of drugs involved nor that he understood that quantity to be "significant." He also contests that a significant amount translates into fifty kilograms. Finally, for the first time on appeal, Duncan advances a due process/separation of powers argument -- that the government unilaterally, and unconstitutionally, determined the level of his sentence by deciding,

---

[15]Duncan received a two-level upward adjustment under U.S.S.G. § 3B1.3 for abusing the public trust in a manner that significantly facilitated the commission of the offense. Thus, his total offense level was thirty-eight. Given that offense level and a criminal history category of I, his guideline range was 235 to 293 months. He was sentenced to 235 months for the drug crime and an additional sixty months, to run consecutively, for the gun crime.

unbeknownst to him, the drug quantity upon which his sentence would be based.[16]

While a trial court's application of the sentencing guidelines is reviewed *de novo*, its factual findings are reviewed only for clear error.[17] "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole."[18] Plain error review applies to claims that were not raised before the trial court.[19]

Rule 32 provides, in pertinent part:

> For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing.[20]

In **United States v. Carreon**,[21] we addressed this rule as relates to a PSR thusly:

> We have nevertheless rejected the proposition that a court must make a catechismic regurgitation of each fact determined; instead, we have allowed the district court to make implicit findings by adopting the PSR. This adopting will operate to satisfy the mandate of Rule 32 when the findings in the PSR are so clear that the reviewing court is not left to second-guess the basis for the sentencing decision.

Unlike in the cases cited to us by Duncan, we are not presented with an instance in which a trial court, although adopting the ultimate conclusion of the PSR relating to

---

[16]Duncan does not now argue -- nor did he in the trial court -- that the sham cocaine should be excluded from the drug calculation for sentencing purposes.

[17]**See United States v. Dixon**, 132 F.3d 192 (5th Cir. 1997).

[18]**Id.** at 201.

[19]**See United States v. Anderson**, 174 F.3d 515 (5th Cir. 1999).

[20]Fed. R. Crim. P. 32(c)(1).

[21]11 F.3d 1225, 1231 (5th Cir. 1994) (internal quotations and citations omitted).

reasonable foreseeability, makes findings that contradict the decisive facts underlying that conclusion.[22] Nor are we confronted with a case where the basis for the PSR's findings is unclear.[23] In the instant case the foundation for the findings in the PSR regarding the foreseeability of the drug quantities involved is manifestly apparent. As the probation officer explained in addressing the objections lodged by Duncan:

> Tapes as well as testimony at trial . . . [reflect] that Duncan believed that he was working to protect a major drug dealer who had substantial amounts of cocaine contained in at least two automobiles on the day in question.

Duncan's complaint that the PSR contains no support for equating the qualitative term "substantial amount[]" with the quantitative term "fifty kilograms," does not constitute grounds for rejecting the PSR for obscurity. It merely reflects the undisputed fact that no evidence was offered at trial establishing that either Duncan or his co-conspirators knew the precise quantity of drugs they agreed to safeguard.

Having rejected Duncan's contention that the trial court failed to make factual findings in compliance with Rule 32, we address whether the trial court committed clear error in determining that Duncan should be held responsible for fifty kilograms of cocaine.

---

[22]**See United States v. Foy**, 28 F.3d 464, 476-77 n.24 (5th Cir. 1994) ("In responding to [the defendant's] objections regarding a finding on reasonable foreseeability, the PSR concluded [the defendant] played a significant role in the drug-trafficking enterprise. . . . However, this finding cannot be attributed to the district court, since the district court determined that [the defendant] was only a minor participant in the conspiracy."); **Carreon**, 11 F.3d at 1230-31 (noting that trial court rejected key theory in PSR supporting foreseeability).

[23]**See United States v. Sherbak**, 950 F.2d 1095 (5th Cir. 1992); **United States v. Graham**, 83 F.3d 1466 (D.C. Cir. 1996) .

10

Duncan's objections to the quantity of cocaine have varied. In objecting to the PSR, he claimed that "he should only be held accountable for the cocaine contained within the car that he escorted." On appeal, however, we have the argument that he should not be held responsible for even twenty-five kilograms of cocaine, and that the trial court clearly erred in finding that: (1) he understood that a significant drug quantity was involved and (2) that "significant" means fifty kilograms or, for that matter, twenty-five kilograms or ten kilograms. Indeed, he now asserts that he was not certain that the vehicles contained drugs, as opposed to drug money.

> Under § 2D1.1(a)(3) of the Sentencing Guidelines, the offense level of a defendant convicted of a drug trafficking offense is determined by the quantity of drugs involved in the offense. This quantity includes both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his "relevant conduct" under § 1B1.3(a)(1)(B). . . . Relevant conduct for conspiratorial activity is defined in § 1B1.3(a)(1)(B) as "all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity." [In other words,] . . . for conspiratorial conduct to be attributed under § 1B1.3(a)(1)(B), that conduct must be both "reasonably foreseeable" to the defendant and within the scope of the defendant's agreement.[24]

Our review of the trial transcript persuades that the trial court did not clearly err in calculating the drug quantity attributable to Duncan. The evidence offered at trial amply supports the finding that Duncan fully grasped that a significant quantity of drugs was involved. The following facts are salient. Duncan knew or believed: that the drug-protection racket pre-dated the rendezvous November 18, 1994; that his co-conspirators had been guarding a warehouse filled with cocaine; that more than half-a-dozen law enforcement

---

[24]**Carreon**, 11 F.3d at 1230 (citations and emphasis omitted).

11

officials would be guarding the shipments on November 18, 1994; that the cocaine would be off-loaded from a tractor trailer; that the cocaine would be loaded into two vehicles; that the drug trafficker was a major player; and that federal agents could be monitoring the protection racket. While Duncan is correct that no evidence proved his awareness regarding the <u>exact</u> quantity of drugs at issue, this fact alone is unavailing.[25] Otherwise, he and other like offenders could avoid punishment for actual drug quantities involved through studied ignorance, notwithstanding their obvious understanding as to the general breadth of the drug enterprise. In fact, the evidence introduced at trial demonstrated that Duncan and his co-conspirators adopted this very ploy. Sentencing courts cannot be neutered by such manipulation. Because fifty kilograms is clearly within the quantity that reasonably should have been foreseeable to Duncan, we reject his argument that the trial court clearly erred in attributing this drug quantity to him.

Finally, Duncan did not raise before the trial court his due process/separation of powers contention. We accordingly view same through the lens of plain error. He offers ostensibly favorable dictum from our opinion in **United States v. Richardson**,[26] but moves too quickly. Neither the holding thereof nor its dictum is of aid.

---

[25]**See, e.g., United States v. Negron**, 967 F.2d 68, 72 (2nd Cir. 1992) ("In order to sentence a defendant on the basis of the total amount of narcotics seized from his coconspirators, the court is not required to conclude that the defendant had actual knowledge of the exact quantity of narcotics involved in the conspiracy; it is sufficient if he could reasonably have foreseen the quantity involved.").

[26]925 F.2d 112 (5th Cir. 1991).

In **Richardson**, the defendant contended that "the power of the executive branch to determine a defendant's sentence based on the amount of money that undercover agents bring to the table in a 'sting' operation violates the separation of powers doctrine [and his due process rights]."[27]

> We agree[d] that if the executive branch had the unilateral power to directly and automatically ratchet up a sentence through these means, one might then argue that such power could constitute the sort of threat to the 'authority and independence' of the judicial branch that the Supreme Court referred to as constitutionally infirm. . . .[28]

Nonetheless, we categorically rejected the defendant's arguments "because the district court clearly retained the authority to find that the amount of money brought to the table was not legitimately part of the conspiracy and was not, therefore, 'relevant conduct.'"[29] We reasoned that "[t]he district court judge is not required to automatically enhance a defendant's sentence simply because the government agents choose to bring a certain amount of money to the table. The judge must make factual findings that the money brought to the table is 'relevant' to the crime."[30]

We also found no violation of due process, remarking that "it would be difficult to conclude that the government unfairly manipulated the amount of money involved in the 'sting' operation" given that both of the defendants "demonstrated an affirmative desire to

---

[27]**Id.** at 117.

[28]**Id.** (citation omitted).

[29]**Id.**

[30]**Id.**

13

launder the money presented [them]."[31]

Duncan attempts to distinguish **Richardson** from his case because there the defendants affirmatively sought larger sums of money from the agents. But, as discussed above, the evidence at trial showed Duncan to be an enthusiastic participant in what he believed to be an extensive drug protection racket.[32] In light of this, the distinction upon which Duncan relies cannot bear the weight he would assign. To the contrary, this case, in all important respects, is on all fours with **Richardson**. For largely the same reasons as stated in that case, we conclude that Duncan failed to establish, under the plain error standard of review, that his sentence was unconstitutionally determined by the executive branch.

For these reasons, Duncan's convictions and sentences are AFFIRMED.

---

[31]**Id.** at 118.

[32]This fact distinguishes the instant case from **United States v. Ramirez-Rangel**, 103 F.3d 1501 (9th Cir. 1997), also relied upon by Duncan.