**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 29, 2009

No. 07-51300

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JUAN CARLOS ARAUJO-CONTRERAS, also known as Juan Carlos Araujo

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
No. 6:07-CR-4-3

Before JONES, Chief Judge, and KING and ELROD, Circuit Judges.

PER CURIAM:[*]

Juan Carlos Araujo pleaded guilty to conspiring to distribute methamphetamine from March 2006 to December 20, 2006, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 846. At Araujo's sentencing hearing, his attorney stated that Araujo had only participated in the conspiracy on December 20, 2006 and objected to factual inaccuracies in the presentence report. The district court adopted the presentence report's drug-quantity calculation, which included both the amount of methamphetamine with which Araujo was directly

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

involved on December 20th (1.1 kilograms) and "relevant conduct" from the conspiracy's previous methamphetamine sales (6.4 kilograms). Araujo was sentenced to 210 months' imprisonment followed by three years of non-reporting supervised release. Araujo now argues on appeal that the district court clearly erred when calculating his drug quantity because the evidence did not show that the 6.4 kilograms was within the scope of his agreement or reasonably foreseeable to him. For the following reasons, we affirm the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In March 2006, Officer Richard Reiger of the Texas Department of Public Safety ("DPS") learned that an organization in Dallas was trafficking methamphetamine. Officer Reiger, acting undercover, subsequently bought methamphetamine from a contact within the methamphetamine trafficking organization. Shortly thereafter, Reiger and Juan Lopez Gomez, another member of the organization, agreed to transport five pounds of methamphetamine to North Carolina in a television set on December 20, 2006.

On December 20, Officer Reiger arranged for Gomez to meet him at a parking lot in Mesquite, Texas. DPS officers also set up surveillance of Gomez at an apartment complex. Gomez left the complex accompanied by defendant-appellant Juan Carlos Araujo and Mauricio Joel Ibarra. Gomez put a television in the trunk of a Honda, and Araujo drove the Honda to the parking lot. Once all three arrived in separate cars, Gomez removed the television, and he and Araujo got into Officer Reiger's car with the television. Officers then arrested Ibarra, Gomez, and Araujo, finding 1.1 kilograms of methamphetamine in the television.

On that same day, officers also searched Ibarra's apartment—apartment 301—at the complex. Inside, the officers discovered U.S. currency totaling $142,897; 50.18 grams of methamphetamine; digital scales; and guns. The

2

officers also found two notebooks outside of apartment 301, each containing ledgers that detailed millions of dollars of methamphetamine transactions. The officers additionally arrested Modesto Contreras Araujo ("Modesto"), Araujo's brother, who was inside apartment 301.

Officers then searched apartment 305, which belonged to Modesto. Inside the apartment, police found an empty television box that contained travel instructions labeled "nor Carolina," as well as digital scales and guns. An occupant of the apartment stated that Modesto had stored methamphetamine in the apartment the previous day and had just removed it.

In January 2007, Araujo and six others, including Ibarra and Modesto, were charged with conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 846. Araujo pleaded guilty to conspiring to distribute methamphetamine from March 2006 to December 20, 2006. At the plea hearing, the prosecutor read a factual basis that Araujo's attorney said was "factually accurate" to "the extent that it details Mr. Araujo's conduct."

In the presentence report ("PSR"), the parole officer recommended a base offense level of 36 under United States Sentencing Guideline § 2D1.1(c)(2). This offense was determined based on the officer attributing 7.5 kilograms of methamphetamine to Araujo (1.1 kilograms in the television set plus 6.4 kilograms of methamphetamine). The 6.4 kilograms were estimated based on the theory that the $142,897 found in apartment 301 represented proceeds from prior drug sales. Araujo also received a two-level increase because of firearm possession and a two-level increase because the methamphetamine was imported from Mexico. The probation officer thus recommended a total offense level of 40, with a Criminal History Category of I because Araujo did not have any prior criminal convictions. This led to an advisory sentencing range of 292–365 months' imprisonment.

Araujo objected to, *inter alia*, the PSR's drug-quantity calculation and to its failure to reduce the sentence for acceptance of responsibility. He specifically asserted that he only participated in the conspiracy on December 20, 2006, the date of the arrest, and that he should not be held accountable for the money found in apartment 301. The probation officer responded to this objection in an addendum, stating that Araujo was responsible for the currency in apartment 301 because he had pleaded guilty to a conspiracy on the dates listed in the indictment, March 2006 to December 20, 2006. The addendum also stated that Araujo had a key to apartment 301 on his key ring and that this suggested he was more involved than simply "being in the wrong place at the wrong time." The officer also noted Araujo's relation to Modesto and that the DPS officers had seen Araujo, Gomez, and Ibarra leaving the apartment complex together.

At the sentencing hearing, Araujo reurged his objection. His attorney stated:

> Mr. Araujo, what he has told me, only recently came to this country or whatever and just recently got involved with these fellows. He was not sure. He knew something was going on, not sure of the depth of it. I understand a conspiracy you don't have to understand all that. He knew he was doing wrong. . . . About the money part of it, that has to do with his recently coming into the country. Once again, there's no way to determine how much money was earned before at—when he entered the conspiracy. The problem with undocumented aliens is there is no documentation to show when he became involved in this or whatever.

Araujo's attorney also noted that the PSR was factually inaccurate because Araujo possessed the key to apartment 305 and not apartment 301, where the money and drugs were found. The prosecutor agreed that the PSR was incorrect insofar as it stated that Araujo had a key to apartment 301. The prosecutor also acknowledged that the PSR falsely stated that Araujo was seen leaving apartment 301; in fact, the officers conducting surveillance were outside the apartment complex and could not see the doors to 301 and 305. Nonetheless, the

4

prosecutor argued that Araujo should be held accountable for the currency because the individuals in both apartments appeared to be working together.

The district court adopted the PSR drug-quantity calculation and sentenced Araujo to 210 months' imprisonment followed by three years of non-reporting supervised release.[1]  Araujo timely appealed.

## II. STANDARD OF REVIEW

"Findings of fact used in calculating the [Sentencing] Guidelines range are reviewed for clear error, while interpretation of the Guidelines themselves is reviewed *de novo*." *United States v. Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009).  "The district court's determination of the amount of drugs attributable to a defendant is a finding of fact reviewed for clear error." *United States v. Posada-Rios*, 158 F.3d 832, 878 (5th Cir. 1998).  If a district court's finding is plausible in light of the record as a whole, there is no clear error. *United States v. Solis*, 299 F.3d 420, 455 (5th Cir. 2002).  A factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court based on all the evidence is left with the definitive and firm conviction that a mistake has been committed." *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777, 779 (5th Cir. 2004) (internal quotation marks omitted).

## III. DISCUSSION

Pursuant to § 2D1.1(a)(3) of the Sentencing Guidelines (the "Guidelines"), the quantity of drugs involved in a drug trafficking offense determines the offense level of a defendant who has been convicted of such a crime.[2]  *See* UNITED

---

[1]  The court reduced the sentence from that recommended in the PSR because it granted Araujo's other objection regarding acceptance of responsibility.

[2]  Araujo preliminarily asserts that criminal liability in a conspiracy is a distinct determination from the amount of drugs attributable as relevant conduct to a conspirator at the time of sentencing.  The government does not contest this point, and this court has often recognized this distinction.  *See, e.g.*, *United States v. Ruiz*, 52 F.3d 531, 540 (5th Cir. 1995) ("[A] sentencing court cannot assume that all acts of each participant in a jointly undertaken criminal activity were reasonably foreseeable to all participants."); *United States v.*

STATES SENTENCING GUIDELINES MANUAL § 2D1.1(a)(3). This quantity of drugs includes both drugs with which the defendant was directly involved and drugs that are attributed to the defendant as part of his "relevant conduct" in a conspiracy. *Id.* § 1B1.3(a)(1)(B). Pursuant to § 1B1.3(a)(1)(B) of the Guidelines, "relevant conduct" includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* "Relevant conduct" is only prospective and therefore "cannot include conduct occurring before a defendant joins a conspiracy." *See United States v. Carreon*, 11 F.3d 1225, 1235–36 (5th Cir. 1994).

Furthermore, under Rule 32 of the Federal Rules of Criminal Procedure, a sentencing court making a determination regarding a disputed portion of a PSR must either "rule on the dispute" or conclude that such a ruling is unnecessary. FED R. CRIM P. 32(i)(3)(B). The court may determine that a ruling is unnecessary if "the matter will not affect sentencing" or if "the court will not consider the matter in sentencing." *Id.* A court's adoption of a PSR complies with Rule 32 when "the findings in the PSR are so clear that the reviewing court is not left to 'second-guess' the basis for the sentencing decision." *Carreon*, 11 F.3d at 1231. This court has often recognized that a district court may make implicit findings when adopting a PSR and need not make a "catechismic regurgitation of each fact determined." *See United States v. Sherbak,* 950 F.2d 1095, 1099 (5th Cir. 1992); *see also, e.g.*, *United States v. Rodriguez-Rodriguez*, 388 F.3d 466, 468 n.8 (5th Cir. 2004); *United States v. Duncan*, 191 F.3d 569, 575 (5th Cir. 1999). In other words, when (as here) a district court explicitly adopts a PSR's findings of fact, it may have implicitly "weighed the positions of the probation department and the defense and credited the probation department's

---

*Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994) ("[R]easonable foreseeability does not follow automatically from proof that the defendant was a member of the conspiracy." (internal quotation marks and alteration omitted)).

facts." *Sherbak*, 950 F.2d at 1099. For instance, in *Duncan*, this court ruled that the district court did not clearly err when it adopted a PSR's finding that fifty kilograms of cocaine could be attributed to a police officer complicit in a New Orleans cocaine trafficking conspiracy. 191 F.3d at 577. The officer argued that the district court's sentence was clear error because there was no evidence that he knew of the specific quantity of drugs or that he knew that the quantity was "significant." *Id.* at 575. The court rejected such arguments because the record contained evidence that the drug trafficking had lasted for an extended period of time and that the officer "fully grasped that a significant quantity of drugs was involved." *Id.* at 576. The court specifically noted that Duncan's alleged lack of awareness about the "exact quantity of drugs at issue" was unavailing because it would permit similar offenders to "avoid punishment for actual drug quantities involved through studied ignorance." *Id.* at 577.

In the present case, Araujo argues that he joined the conspiracy on December 20, 2006, and thus the earlier 6.4 kilograms of methamphetamine is not attributable to him as relevant conduct. It is true that the court did not explicitly rule on when Araujo joined the conspiracy, and the PSR did contain errors regarding both the apartment key in Araujo's possession and the surveillance outside of the apartment complex. The government itself concedes—and we agree—that "an express finding of when a defendant joined a conspiracy and what was foreseeable is preferred."

However, as noted above, this court has often recognized that a district court adopting a PSR need not make a "catechismic regurgitation of each fact determined" and that implicit findings are not clear error when there is no need to "second-guess" the basis for the sentencing decision. In the present case, the district court's ruling that the additional 6.4 kilograms were foreseeable and within the scope of his agreement appears plausible in light of the record as a whole. The record here shows that Araujo was a full participant in the

7

methamphetamine transaction on December 20, suggesting that he had familiarity with the process of such a drug transaction. He was seen leaving the apartment complex and possessed a key to apartment 305, the apartment that had stored methamphetamine and contained the television box, "nor Carolina" travel directions, scales, and firearms. This apartment's probable proximity to apartment 301, which contained the $142,897, also makes it plausible that Araujo had some involvement with the high volume of methamphetamine sales that garnered that large sum of money. Modesto, Araujo's brother, was also in apartment 301 at the time the officers searched it, yet he was living in apartment 305; such inter-apartment movement suggests a strong link between the two apartments by a member of Araujo's family. In this way, the district court's finding here is comparable to that of the court in *Duncan*, where the various pieces of evidence in the record "amply support[ed] the finding that Duncan fully grasped that a significant quantity of drugs was involved." Similarly, the various pieces of evidence in the record amply support the finding that Araujo was involved in the conspiracy when it sold 6.4 kilograms of methamphetamine. Indeed, the district court either implicitly rejected Araujo's attorney's claim that he had only recently joined the conspiracy or, if it accepted that Araujo was a recent participant, implicitly found that the 6.4 kilograms had been sold in a "recent" transaction. The district court thus did not clearly err.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.