# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 6, 2022

Lyle W. Cayce
Clerk

No. 19-11318

Shelton L. Bonds,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
No. 3:18-cv-1299

Before Smith, Elrod, and Oldham, *Circuit Judges.*

Jerry E. Smith, *Circuit Judge*:*

A jury convicted Shelton Bonds of possessing more than 400 grams of cocaine with intent to deliver. After exhausting his grounds for appeal and

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

collateral attack in the state system, Bonds petitioned the district court for habeas corpus relief on seven grounds. The court rejected each ground and denied his petition, concluding that he hadn't shown that the state court's decision was contrary to or an unreasonable application of federal law. We granted Bonds a certificate of appealability on three of those grounds: two challenges to the effectiveness of his trial counsel and a follow-on contention that those two claimed mistakes cumulatively deprived him of the right to a fair trial. We affirm because the decisions that Bonds challenges were objectively reasonable.

## I.

Bonds's ineffective-assistance-of-counsel ("IAC") claims arise from potential challenges to both the seizure of evidence and the composition of the petit jury. So, we briefly recount the circumstances surrounding his arrest, trial, and post-conviction proceedings.

## A.

The state trial court found the following relevant facts while adjudicating a motion to suppress evidence: Josh Ellis, a Rockwall, Texas, peace officer, stopped a car on Interstate 30 after seeing it twice change lanes without signaling. The car contained two men, both appearing nervous. The driver identified himself as Kendrick Allen by giving Ellis an out-of-state driver's license. Ellis asked Allen to exit the vehicle, then directed Allen to identify the passenger and explain where he was going and what he was doing in Texas. Allen said he was visiting somewhere nearby but didn't recall the name of the place. He said he was there to attend his cousin's funeral and had been there for three days. Allen could not give Ellis the passenger's full name.

Ellis then questioned the passenger, who identified himself as Shelton Bonds and told Ellis that he and Allen had been visiting Bonds's brother in

Dallas and had been there for one day. Bonds identified Allen only as "Ken" and didn't know his last name. While speaking with Bonds, Ellis smelled marihuana and noticed "mari[h]uana residue" in the car's center console. Ellis told the men he was going to search the car based on the evidence of marihuana use. He ordered Bonds to exit the car. As Bonds complied, Ellis noticed a syringe in the "door handle."

Ellis entered the car and began searching it. He folded down the back seat to access the trunk and noticed a duffle bag under the spare tire. In the bag, he found more than 2½ pounds of cocaine along with some personal effects. Ellis arrested Allen and Bonds, who were charged with possession of cocaine with intent to deliver.

## B.

The state trial court appointed attorney Sharita Blacknall to defend Bonds. She got Bonds a plea-bargain offer of ten years' imprisonment. He declined the offer, and the case proceeded to trial.

Blacknall moved to suppress the fruits of Ellis's search on two grounds. *First*, she said the length of the detention was illegal because Ellis had no reasonable suspicion of any crime beyond a minor traffic violation. *Second*, she said the search wasn't supported by probable cause because Ellis lied about smelling marihuana and observing a syringe. She pointed out that no marihuana, residue, related paraphernalia, or syringe was ever introduced into evidence.

The trial court denied the motion, concluding that Ellis "was credible." From that finding of fact and those recounted above, it reasoned as follows: The initial stop was justified by reasonable suspicion because Ellis personally observed traffic violations. Ellis had reasonable suspicion of more crimes throughout the stop because Allen and Bonds gave conflicting stories and appeared nervous. Ellis had probable cause to search the car because he

smelled marihuana and observed "mari[h]uana residue" in the vehicle. Thus, the court concluded, the search was legal.

On top of suppression motions, Texas criminal procedure allows the jury to be instructed to "disregard" illegally obtained evidence, but only if the "evidence raises [a relevant] issue." Tex. Code Crim. Pro. Ann. art. 38.23(a). Obtaining that jury instruction thus requires an "issue of fact" that is "affirmatively contested." *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012). Accordingly, the trial judge informed Blacknall that she could "submit [the legality of the search] to the jury" if "raised by some [connected] fact issue."

The parties then began selecting jurors. The most relevant part of that process occurred during Blacknall's voir dire. She asked the veniremen whether any of them "believe[d] that [Bonds must have] done something wrong" to have ended up as a criminal defendant. One replied, "I don't think that you just happen to have 400 grams of cocaine hanging with you. I don't think that's an accident." Two others indicated agreement.

Then, a venireman who had just agreed with that statement said, "I guess there's been a lot of discussion about . . . somebody getting off on a technicality, and I agree 100 percent." Bonds's attorney followed up, "That people should not get off on technicalities?" The venireman said, "Right." Bonds's attorney then asked the veniremen to raise their hands if they agreed "on that." Several new veniremen then raised their hands, including Arturo Sanches, who eventually became juror number eight.

Blacknall continued the discussion by asking what those veniremen meant by "technicality." The group reached no consensus. For instance, one venireman opined, "I think our law is based upon procedure. . . . I think everything is on a procedure. And it's not a technicality. It's a procedure. It's our law." The veniremen largely agreed that distinguishing between

technicalities and law is "a matter of opinion" and "how you interpret the law."

After voir dire, Blacknall and the prosecutor submitted their peremptory and for-cause challenges. Neither Blacknall nor the state challenged Sanches's inclusion by either mechanism.

Blacknall's defense at trial was two-fold. *First*, she asked the jurors to disbelieve Ellis's testimony that he had smelled marihuana. She contended that the search was pretextual and illegal and that the jury should refuse to consider the cocaine it turned up. *Second*, in the alternative, she maintained that the evidence didn't establish Bonds's constructive possession of the cocaine. She portrayed Bonds as merely a passenger, present only to give Allen credibility with the cocaine supplier, Bonds's brother.

That second defense had a big problem: Allen turned state's evidence. He said Bonds was in on the whole thing. According to Allen, Ellis was right to be suspicious of their irreconcilable stories—they were lying. Allen and Bonds came to Dallas not for a funeral, but to buy cocaine to take back to Tennessee to sell. What's more, he said Bonds arranged the deal.

After that, to challenge successfully the state's case that Bonds constructively possessed the cocaine with intent to deliver, Blacknall needed to attack Allen's credibility. And that's what she did. On cross-examination, Blacknall pointed out that Allen was self-interested and received a dramatically reduced sentence in exchange for his cooperation. She recounted some of his prior offenses and asked whether he had "been making a habit of testifying against people in order to get [his] sentences lowered." During her closing argument, she brought the point home: "[T]he story that [Allen] told . . . here is the story that [the state] gave him [a short sentence] to come here and tell you."

Following closing arguments, the parties discussed the proposed jury

instructions. Blacknall fended off the state's request that the jury be instructed to consider whether Allen consented to the search. She also successfully obtained an instruction that the jury "wholly disregard" evidence obtained from a search unsupported by probable cause, defined as the "facts and circumstances within the officer's knowledge[ ] that are sufficient unto themselves to warrant a man of reasonable caution to believe than an offense has been or is being committed." Blacknall didn't request a similar jury instruction defining reasonable suspicion.

During their deliberation, the jurors submitted a note that asked, "Is probable cause in this case based solely on Officer Ellis recognizing [the] smell of mari[h]uana[,] or can inconsistencies in Allen['s and] Bonds['s] replies to Officer Ellis affect . . . probable cause?" The court explained that it couldn't provide any more information.

The jury convicted Bonds of possession with intent to deliver and sentenced him to fifty-four years' imprisonment and a $35,000 fine.

## C.

Bonds got a new court-appointed attorney and appealed; the court of appeals affirmed. It rejected Bonds's contention regarding reasonable suspicion because the trial court's conclusion that the men's nervousness and conflicting stories justified further detention was supported by the record. The Court of Criminal Appeals ("CCA") refused discretionary review.

Bonds filed a habeas petition in the CCA. He raised IAC regarding both decisions he challenges here: failure to request a jury instruction defining reasonable suspicion and failure to strike Sanches from the jury. The CCA remanded to the trial court for further factfinding.

In that proceeding, Blacknall filed an affidavit justifying her decisions. She explained that she didn't request a definition of "'reasonable suspicion'

because reasonable suspicion was necessary for the traffic stop, and the traffic stop was not contested." She said she didn't move to strike Arturo Sanches because he "did not respond to any question that he could not follow the law" and was not "asked the question referred to in Mr. Bonds['s] application." She filed that affidavit more than three years after the trial.

The state trial court made a new finding. It said Sanches didn't "respond to any question with a reply that would indicate or say that he could not follow the law and . . . he was not asked a question referenced by [Bonds] in his application for a writ of habeas corpus." It also concluded that a jury instruction defining reasonable suspicion could not have been requested under Texas criminal procedure because "there was no conflict in the evidence that raised a disputed fact issue material to [that] legal question." With that in the record, the CCA denied Bonds's petition without opinion.

Having exhausted his potential state remedies, Bonds filed a federal habeas petition. The district court denied his petition, adopting the Findings, Conclusions, and Recommendations of the magistrate judge, who explained that Bonds had failed to satisfy the exacting standard for federal review of a state merits decision established by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d). [1] We granted Bonds a certificate of appealability on three claims: (1) that Blacknall was ineffective in failing to (a) challenge Sanches for cause and (b) request a jury instruction defining "reasonable suspicion," and (2) that the cumulative effect of those

---

[1] Bonds then informed the court that he had mailed objections that were never delivered on account of an ongoing "attempt by parties related to the filing of prisoners' pleadings to interfere with [prisoners'] access to court," which "rendered [his] pleadings untimely." The district court then reviewed Bonds's objections and amended its order to reflect that it was adopting the magistrate judge's Findings, Conclusions, and Recommendations because Bonds's objections were "without merit."

claimed errors denied a fair trial.

## II.

When we review the disposition of a habeas petition, we assess the district court's findings of fact "for clear error" and its legal conclusions *de novo*.[2] Whether counsel provided IAC is a "mixed question of law and fact."[3] So, we "independently apply[ ] the law to the facts found by the district court" unless those findings were "clearly erroneous."[4]

Here, we review claims that a state court has rejected "on the merits." *See* 28 U.S.C. § 2254(d). Under AEDPA, a petition for a writ based on legal defects in that adjudication "shall not be granted" unless the state system's final decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See id.* § 2254(d)(1). Defects in factfinding may result in a successful petition if they were "unreasonable . . . in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). A "prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)).

A state court's decision is "'contrary to' clearly established federal law if it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th

---

[2] *Moore v. Vannoy*, 968 F.3d 482, 485 (5th Cir. 2020) (quoting *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009)).

[3] *Richards*, 556 F.3d at 561 (quoting *Ward v. Dretke*, 420 F.3d 479, 486 (5th Cir. 2005)).

[4] *Id.* (quoting *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th Cir. 2005)).

Cir. 2004).  A state court unreasonably applies Supreme Court precedent where it "correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." *Id.* (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

To satisfy either standard, Bonds must show "that the state court's ruling on [his claims] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). That "standard is difficult to meet." *Id.* at 102.  And it becomes even more difficult where the relevant rule of federal law is "general," leaving courts "leeway . . . in reaching outcomes in case-by-case determinations." *Id.* at 101.

Bonds contends that the state decision conflicted with federal law governing the constitutional adequacy of assistance of counsel, which he says was "clearly established" by *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), and its progeny.[5]  Few rules of law are more "general" than *Washington*'s "reasonably effective assistance" of counsel standard. *See id.*  Accordingly, our review of the state court's application of *Washington* is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  We defer to the state court in that we may decide only whether "the state court's application of the [*Washington*] standard was unreasonable," not whether it was correct. *Richter*, 562 U.S. at 101.  And that review encompasses deference to Bonds's attorney because, under *Washington*, an attorney is "strongly

---

[5] Most notably, Bonds points also to *Hinton v. Alabama*, 571 U.S. 263, 272–76 (2014), and *Morgan v. Illinois*, 504 U.S. 719, 725–33 (1992).  *Morgan* is not an IAC case but is offered for the proposition that the right to an impartial jury "demand[s] inquiry into whether the views of prospective jurors . . . would disqualify them from sitting."  504 U.S. at 731.  It bears observing here that *Morgan* established that principle in the context of jurors' attitudes about the death penalty, not their general predispositions. *See id.* at 728.

presumed to have rendered adequate assistance." *Titlow*, 571 U.S. at 22 (quoting *Washington*, 466 U.S. at 690).

## A.

We begin with Blacknall's decision not to challenge Sanches's jury service. Bonds reasons that the state court unreasonably applied *Washington* by failing to recognize that the only reason Blacknall didn't strike Sanches was her "mistake or in[a]ttention." To support that claim, he asserts that every other venireman who raised his or her hand to express agreement that "people should not get off on technicalities" was "deemed biased against the law and dismissed for cause." Bonds says the record belies Blacknall's *post hoc* explanation for her decision because it shows that Sanches responded to the same question in the same manner as did several other veniremen who were struck for cause.

Based on his view of the record, Bonds reasons that Blacknall clearly provided IAC under *Washington*'s two-pronged test[6] because (1) a mistake is *per se* deficient assistance and (2) it caused him prejudice because he was deprived of the right to an impartial jury. He relies on *Virgil v. Dretke*, 446 F.3d 598, 614 (5th Cir. 2006), to insist that Blacknall's performance was "'objectively unreasonable' . . . for failing to use a peremptory or for-cause challenge in response to the testimony of jurors . . . that unequivocally expressed bias."

To evaluate that claim, we need to set the record straight. The state trial court may have found that Sanches was never asked the question about

---

[6] *See Busby*, 359 F.3d at 714 ("To make out a claim of ineffective assistance of counsel, [a petitioner] must show both that his counsel's performance was deficient . . . and that he was prejudiced by his counsel's deficient performance.") (citing *Washington*, 466 U.S. at 687–88).

acquittals "on technicalities."[7]  If that's what the court meant, Bonds has rebutted that finding by "clear and convincing evidence," as AEDPA requires.[8]  The transcript of the voir dire is unequivocal that the question was posed to all veniremen and that Sanches responded in the same manner as did several others.  If the court merely meant that Sanches never said or indicated that he couldn't follow the law, that finding hasn't been rebutted and is entitled to our deference.

Even though Sanches indicated his belief that "people should not get off on technicalities," Bonds's claim lacks merit for three reasons.  *First*, a for-cause challenge to Sanches would have been futile.  *Second*, Blacknall had a legitimate reason to want Sanches on the jury.  *Third*, even if including Sanches had been a mistake, Bonds hasn't shown prejudice.

Bonds's statement that the veniremen who raised their hand at the same time as Sanches were all "deemed biased against the law and dismissed for cause" is partially incorrect and entirely misleading.  Not including Sanches, fourteen veniremen spoke or raised their hands during the relevant exchange.  One of them was removed by peremptory challenge, not for cause.  Five of them were never fully considered because a jury was empaneled before reaching them.  The remaining eight were struck for cause, but for other reasons.  Of those, four said they couldn't serve as unbiased jurors.  The other four indicated that they could not consider the full sentencing range required by the statute.  In other words, not one of the other fourteen veniremen was struck for cause just because he or she raised a hand at the

---

[7] It said, "Sanche[s] did not respond to any question with a reply that would indicate . . . that he could not follow the law and . . . he was not asked a question referenced by [Bonds] in his application for [a] writ of habeas corpus."

[8] *See* 28 U.S.C. § 2254(e)(1).

same time Sanches did.

That observation vitiates Bonds's inference that the parties or the court regarded a belief that "people should not get off on technicalities" as disqualifying. Indeed, we know the court didn't. Its finding that Sanches never indicated "that he could not follow the law" means that a challenge for cause would have been rejected. "[C]ounsel is not required to make futile motions or objections." *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

Blacknall also had a good reason not to use a peremptory challenge. During voir dire, Blacknall asked Sanches his opinion about the Texas rule that a codefendant's testimony cannot be the sole basis for a conviction; it must be corroborated. Sanches said the rule was important to making a "sound decision" and to avoid overweighting self-interested testimony. That opinion made his presence on the jury attractive to the defense because discrediting Allen's testimony was critical to Bonds's case. We will not second-guess a reasonable strategic decision on collateral review.[9]

Bonds points out that the explanation in Blacknall's affidavit mirrors the trial court's findings of fact in saying she didn't move to strike Sanches because he "did not respond to any question that he could not follow the law" and was not "asked the question referred to in Mr. Bonds['s] application." Like the trial court's finding, that statement is ambiguous as to whether Sanches responded to the question whether "people should get off on technicalities." If Blacknall merely meant that Sanches never indicated he couldn't follow the law, and was therefore not disqualified from jury service,

---

[9] *See Hinton*, 571 U.S. at 274 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.") (quoting *Washington*, 466 U.S. at 690–91).

she was correct.

In any event, the affidavit is immaterial because we inquire only "into the objective reasonableness of [Blacknall's] performance, not [her] subjective state of mind," and we strongly presume that her decisions reflect "trial tactics rather than 'sheer neglect.'"[10] We may neither "indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions" nor "insist counsel confirm every aspect of the strategic basis for . . . her actions."[11] Given the importance to Bonds's case of successfully impeaching Allen's testimony, Sanches's desirability as a juror based on his favorable relevant comments is a reasonable inference to draw from the record. We do not agree with Bonds that the only explanation for his inclusion is "mistake or in[a]ttention."

On the second *Washington* prong, we have no basis to upset the state court's decision that Bonds hasn't "demonstrated prejudice based on Mr. Sanche[s's] selection." Bonds must "affirmatively prove" that the outcome of his trial would have been different had Sanches been excluded from the petit jury. *See Washington*, 466 U.S. at 693. As the magistrate judge and district court concluded, "Sanches simply silently raised his hand in agreement to the general statement that 'people should not get off on technicalities.'"

That statement is consistent with Sanches's earlier affirmations that he could serve as an impartial juror. There's no disagreement between the statements, "I don't support the policy motivating the Exclusionary Rule," and, "I will apply the Exclusionary Rule because it is the law." It isn't obvi-

---

[10] *Richter*, 562 U.S. at 109–10 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)).

[11] *Id.* at 109 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003)).

ous that Sanches's apparent view "substantially impair[ed] the performance of his duties as a juror" because he could have disliked the Exclusionary Rule and still faithfully considered whether the search was lawful.[12]   The state court's holding that Bonds failed to prove prejudice is therefore not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.  Far from it.

*Virgil* is not to the contrary.  As the magistrate judge and district court recognized, the facts in *Virgil* were "significantly more egregious."  There, one juror had said, "[N]o," when asked during voir dire whether he could "serve as an impartial juror."  446 F.3d at 603.  Another juror had similarly replied, "Yes, I do believe so," when asked if his personal experiences would render him incapable of being "fair and impartial."  *Id.* at 604.  Since those statements "unequivocally expressed bias," we concluded that rejecting an ineffective assistance of counsel claim predicated on the failure to challenge those jurors was clearly contrary to *Washington*.  *Id.* at 614.

But Sanches's statements didn't even equivocally indicate bias against Bonds.  Sanches expressed an abstract policy preference consistent with unbiased jury service.  And he elsewhere expressed views that were helpful to one of the defense's principal lines of argument.

Bonds has not shown that it was "contrary to [or] an unreasonable application of" *Washington* to reject an IAC claim based on Blacknall's decision not to challenge Sanches's inclusion on the jury.  28 U.S.C. § 2254(d)(1).  So, AEDPA requires us to reject that claim.

---

[12] *See United States v. Duncan*, 191 F.3d 569, 573 (5th Cir. 1999) (quoting *United States v. Hall*, 152 F.3d 381, 406–07 (5th Cir. 1998)).

B.

Next, we consider Blacknall's decision not to request a jury instruction defining "reasonable suspicion." According to Bonds, that decision was erroneous because the traffic stop was illegally prolonged, and the jury should have been given an opportunity to consider that under the proper legal standard. He says the jury note requesting clarification on the meaning of "probable cause" proves that the decision prejudiced him because the note reflects the jurors' perception "that there was a gap in the law contained in the jury charge [regarding] the legality of the [search and seizure]."

Again, Bonds challenges Blacknall's *post hoc* explanation. She said she didn't request the instruction because "reasonable suspicion was necessary for the traffic stop, and the traffic stop was not contested." Bonds says that's mistaken because the *length* of the traffic stop was or should have been at issue, and that, too, had to be justified by reasonable suspicion. That may be true. But once more, we don't review Blacknall's subjective explanation three years after the trial; we examine "the objective reasonableness of [her] performance." *Richter*, 562 U.S. at 110.

With that in mind, Bonds's contention has three flaws. *First*, it misapprehends what Blacknall was free to submit to the jury under Texas law. *Second*, Bonds can't show prejudice because the jury would almost certainly have concluded that reasonable suspicion justified the entire detention. *Third*, focusing the jury's attention on probable cause rather than reasonable suspicion was a valid trial strategy that we won't second-guess.

It would have been futile for Blacknall to request a jury instruction defining reasonable suspicion. As we have explained, submitting a procedural ground for exclusion of evidence to a Texas jury requires it to be raised by an affirmatively contested issue of fact. *Hamal*, 390 S.W.3d at 306. There was such an issue on probable cause: whether Ellis smelled marihuana. And

Blacknall made that issue a central theme of her argument to the jury.

Blacknall couldn't have done the same for reasonable suspicion. Bonds has never disputed the facts relevant to the justification for the stop or its length. As the trial court found, Ellis personally observed Allen illegally swerving between lanes. Allen provided Ellis with an out-of-state driver's license, and Ellis asked Allen and Bonds separately where they were coming from. The men provided inconsistent answers, did not appear to know each other well, and seemed nervous. Bonds couldn't reasonably have "affirmatively contested" any of those facts, and so the question of reasonable suspicion was inappropriate for the jury.

What's more, we needn't speculate about whether the trial court would have rejected the instruction if Blacknall had proposed it. The same court that conducted the trial later rejected that precise argument. It concluded, "there was no conflict in the evidence that raised a disputed fact issue material to the legal question of 'reasonable suspicion' as it related to the stop. Therefore, a definition of 'reasonable suspicion' was not warranted in this Court's jury charge . . . and the trial counsel's performance did not fall below an objective standard of reasonableness in not requesting such a definition." Blacknall wasn't required to waste her breath. *See Koch*, 907 F.2d at 527.

Bonds also can't demonstrate prejudice because the jury would almost certainly have concluded that reasonable suspicion justified the length of the stop. When police ask multiple detainees about their travel plans, major inconsistencies unlikely to have an innocent explanation, such as failure to "agree on which major city [detainees] had spent the last several days visiting or whom they had visited there," can support reasonable suspicion, especially combined with "nervousness" and "traveling along a drug trafficking corridor." *See United States v. Pack*, 612 F.3d 341, 358–61 (5th Cir. 2010). As

the trial court found, Allen and Bonds didn't agree where they had been, how long they had been there, or whom they had visited, and they were visibly nervous and traveling along Interstate 30.  The case for reasonable suspicion was strong.

Bonds says otherwise, pointing out that the jury submitted a note asking, "Is probable cause in this case based solely on Officer Ellis recognizing [the] smell of mari[h]uana[,] or can inconsistencies in Allen['s and] Bonds['s] replies to Officer Ellis affect . . . probable cause?"  That note hurts Bonds's case if it's relevant at all.  If anything, it shows hesitation to credit Ellis's testimony and desire to *bolster* the case for probable cause with the suspicious inconsistencies.  There's no way to read that note to reveal that the jury would have discredited the inconsistencies if it was instructed to consider whether they established reasonable suspicion—especially since reasonable suspicion is a lower threshold than is probable cause.

To top it off, even if Texas law had allowed the instruction and even if reasonable suspicion was debatable, it still wouldn't have been IAC to decline to pursue the instruction. Blacknall properly challenged both reasonable suspicion and probable cause in Bonds's motion to suppress.  When it came time to decide what to submit to the jury, it was reasonable to narrow the issues to sharpen the jury's focus.  Sometimes less is more.  It's clearer to say, "[Ellis's] story . . . was just that, a story," than something like, "The inconsistencies between Allen's and Bonds's stories weren't major enough to combine with their nervousness and presence on a major drug corridor to create a reasonable inference of illegality based on specific and articulable facts.  And even if you don't agree with that, Ellis lied."  The strategic decision to challenge only Ellis's credibility was objectively reasonable, and the jury note suggests that it nearly worked.

Bonds hasn't shown that it was "contrary to [or] an unreasonable

application of" *Washington* to reject an IAC claim based on Blacknall's decision not to request a jury instruction defining "reasonable suspicion." 28 U.S.C. § 2254(d)(1).  AEDPA again requires us to reject that claim.

## C.

Bonds asks us to apply the cumulative-error doctrine.  That is, he invokes the principle that "an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal."[13]  That doctrine applies "only in the unusual case in which synergistic or repetitive error" prejudices the defendant.  *Id.* at 344.

Bonds claims that happened here because Blacknall's supposed errors were "inextricably intertwined."  He says Blacknall ought to have struck a juror who expressed distaste for procedural grounds for acquittal, and that she should have tried to introduce another procedural ground for acquittal. In other words, he contends that those asserted errors were compounding. So, the argument goes, even if they were individually insufficient to merit reversal under AEDPA, their combined effect clearly deprived him of a fair trial.  Thus, he says, it was "contrary to [or] an unreasonable application of" *Washington* for the state court to reject his IAC claim.

We disagree because we have already concluded that neither of those decisions was erroneous.  Zero plus zero equals zero.[14]  The cumulative error doctrine has no application here.

Having failed to demonstrate even that his trial counsel was ineffective, Bonds has fallen far short of AEDPA's exacting requirement for relief.

---

[13] *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc) (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)).

[14] *See* Margherita Barile, *Additive Identity*, Wolfram MathWorld, https://mathworld.wolfram.com/AdditiveIdentity.html (last visited Dec. 15, 2021).

No. 19-11318

The judgment denying his petition for a writ of habeas corpus is AFFIRMED.